1  James A. Dumas (SBN 76284)
   Christian T. Kim (SBN 231017)
2  DUMAS & KIM, APC
   3435 Wilshire Blvd., Ste. 990
3  Los Angeles, CA 90010
   Telephone: 213/368-5000
4  Facsimile: 213/368-5009

5  Attorneys for the Chapter 7 Trustee,
   Carolyn A. Dye
6

7                    UNITED STATES BANKRUPTCY COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9                         LOS ANGELES DIVISION

10

11  In re:                              Case No.: 2:17-bk-10301-BR

12                                      [Chapter 7]

13  TEMPLE CB, LLC,                     [Honorable Barry Russell]

14           Debtor.                    TRUSTEE'S MOTION FOR ORDER
                                        AUTHORIZING SALE OF REAL
15                                      PROPERTY OF THE ESTATE [4350
                                        Temple City Boulevard, El Monte, CA
16                                      91731] FREE AND CLEAR OF LIENS AND
                                        INTERESTS, SUBJECT TO HIGHER AND
17                                      BETTER OFFERS, AND APPROVING
                                        OVERBIDDING PROCEDURES;
18                                      DECLARATIONS CAROLYN A. DYE AND
                                        JEFF LUSTER IN SUPPORT THEREOF
19

20

21                                      Date:  November 14, 2017
                                        Time: 10:00 a.m.
22                                      Place: 255 E. Temple Street
                                               Courtroom 1668
23                                               Los Angeles, CA 90012

24

25

26

27

28

                                    1

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR AND ITS COUNSEL OF RECORD, AND ALL INTERESTED PARTIES:**

Carolyn A. Dye, the Chapter 7 Trustee (the "Trustee") for the estate of Temple CB, LLC ("Debtor"), hereby moves the Court for an order authorizing her to sell the real property located at 4350 Temple City Boulevard, El Monte, CA 91731 (APN: 8577-001-028 & 041) (the "Property") free and clear of liens and interests, and subject to higher and better offers, and approving overbidding procedure. The proposed buyer is El Monte SS Properties, LLC ("Buyer") which is proposing to pay a total consideration of Eight Million Dollars ($8,000,000). The estate will pay $400,000 in sales commissions (5%) and the usual closing costs (estimated at 2%). Buyer has paid a total of Two Hundred Forty Thousand ($240,000) as a deposit into escrow. Escrow is scheduled to close within fourteen (14) days of the date on which the order approving the sale of the Property is entered on the Court's docket. The sale is on an "as is - where is" basis and not subject to any contingencies.

This Motion is made on the grounds that the sale is in the best interest of the estate, is an exercise of Trustee's reasonable business judgment and the sales price for the Property is fair and reasonable. The Motion is based upon 11 U.S.C. sections 363(b), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure. It is also based upon the Notice of Motion which is being served upon all interested parties, this Motion, the attached Memorandum of Points and Authorities, the Declaration of Carolyn A. Dye, the records and files of this case, and such oral and documentary evidence as may be presented at or prior to the hearing on the Motion. The Trustee has accepted this offer subject to overbid and bankruptcy court approval.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### FACTUAL BACKGROUND

**The Bankruptcy**. The debtor, Temple CB (the "Debtor") filed a voluntary Chapter 11 bankruptcy petition on January 10, 2017. On February 1, 2017, less than a month after the Chapter 11 filing, the Office of the United States Trustee ("OUST") filed a motion to dismiss or convert the

Debtor's bankruptcy case. An order converting the Debtor's case to a Chapter 7 case was entered on March 17, 2017. Carolyn A. Dye was appointed chapter 7 trustee.

The Trustee investigated the viability of selling the Property to pay creditors. When it was determined that the value of the Property was sufficient to pay all scheduled creditors, in full, and notwithstanding certain environmental and land use issues with the Property, the Trustee contacted her brokers to commence the marketing process and determine the value of the Property. A motion for authority to retain brokers was filed on May 31, 2017.

In response to the Trustee's marketing of the property, on June 22, 2017, the Debtor filed an emergency motion to dismiss the bankruptcy. The request for an order shortening time was denied and at a hearing held on July 12, 2017, this initial motion to dismiss was denied without prejudice. A second motion to dismiss was filed on July 27, 2017. At a hearing held on September 27, the Court stated its general agreement with the position stated by the Trustee in her opposition to the motion that the Debtor had failed to make the necessary showing that dismissal was in the best interests of creditors and the matter was continued to November 14, 2017.

Prior to the September 27 hearing, the Trustee had opened an escrow and entered into a contract for sale of the Property for the sum of $8 million to TB Holdings LLC Pension Plan ("TB Holdings"). As of September 27, TB Holdings had deposited $240,000 in the escrow but said deposit was not yet non-refundable. On October 14, TB Holdings entered into an "Assignment Agreement" with El Monte SS Properties, LLC ("El Monte SS") under the terms of which El Monte SS stepped into the shoes of TB Holdings in the pending escrow. The trustee executed a written Consent to this assignment. On October 18, the buyer's $240,000 deposit became non-refundable and on October 19, El Monte SS deposited its own $240,000 into the escrow and the existing deposit was returned to TB Holdings.

Based on the information available to the Trustee concerning scheduled and filed claims against the estate, she believes a sale of the Property for $8 million should leave enough sales proceeds to pay a substantial dividend to general unsecured creditors (and payment in full to creditors who filed timely claims).

## II.

## TERMS OF THE SALE

Trustee proposes to sell the Property to El Monte SS Properties, LLC ("Buyer") for a total consideration of Eight Million Dollars ($8,000,000). The estate will pay between $200,000 and $400,000 in sales commissions (between 2 1/2% and 5%) and the usual closing costs (estimated at 2%). Buyer has paid a total of Two Hundred Forty Thousand ($240,000) as a deposit into escrow. Escrow is scheduled to close within fourteen (14) days of the date on which the order approving the sale of the Property is entered on the Court's docket. The sale is on an "as is - where is" basis and not subject to any contingencies.

The contract of sale is set forth in the "Counter Offer" attached as **Exhibit A** to the Declaration of Carolyn A. Dye, as modified by the "Assignment Agreement" which is attached thereto as **Exhibits B.**

     A.    Condition of the Property

The sale is on an "as is - where is" basis. In addition to those matters previously disclosed, Trustee has been advised but has not confirmed herself, that the electronical wiring has been removed from the main where house the Trustee makes no warranties nor representations of any kind as to the condition of the Property in connection with the sale. The Trustee and Buyer agree to the following conditions:

     1.    The Trustee will not undertake to make any repairs, preventative or otherwise.

     2.    The sale is subject to bankruptcy court approval which shall necessarily include an overbid process.

     B.    Broker's Commission.

Pursuant to the Trustee's listing agreement with Major Properties and Coldwell Banker ("Brokers"), and subject to bankruptcy court approval, Brokers are to receive compensation from the estate of commission equal to a total of two and one-half percent (2.5%) of the gross sales price of the Property, of which, 1.25% shall be paid to Major Properties, 1.25% to Coldwell Bankers. A further 2.5% may be paid to an agent of the buyer, if one is identified prior to the hearing. Such commission is to be paid only if the sale of the Property is actually consummated and only out of the

1    actual cash proceeds of the sales. The commission payable will be split as provided in the executed

2    contracts. If a sale is confirmed to an overbidder represented by a different broker, then the proposed

3    commission will be divided between the Trustee's Brokers (Major Properties and Coldwell Banker)

4    and any broker for the successful overbidder. Commissions will be paid through escrow.

5          C.     Overbidding Procedures.

6          One of the conditions of the offer is that the Trustee must seek approval from the bankruptcy

7    court and the sale is subject to overbids. Trustee submits the following terms and conditions for the

8    submission of overbids to purchase the Property at the hearing on the Motion.

9          1.     Minimum Overbids. The minimum overbid for the Property shall be $75,000 above

10   the present offer and any subsequent overbids shall be at least $25,000 over the preceding offer.

11         2.     Minimum Deposits. A minimum deposit of $240,000, plus the initial overbid of

12   $75,000, or a total of $315,000, shall be by cashier's check payable to "Carolyn A. Dye ATF Temple

13   CB, LLC," and must accompany any overbid offer for the Property with evidence of the ability to

14   close the transaction. In the event the approved Buyer does not close the transaction, the deposit will

15   be non-refundable if the overbid is accepted and the sale does not close within fourteen (14) days of

16   the date on which the Order approving the sale of the Property is entered by the Court.

17         3.     Overbidders are requested to submit to the Trustee, not later than 48 hours before the

18   hearing date, a cashier's check for the required deposit and evidence of the ability to close. The

19   Trustee will promptly advise any proposed overbidder of any disapproval of qualifications, giving the

20   overbidder an opportunity to correct the deficiency. The Trustee holds sole discretion in accepting

21   and rejecting all overbids. In any event, the proponent of each overbid must submit, not later than

22   one hour prior to the date and time of the hearing on the sale, a cashier's check for $315,000 and

23   evidence of the financial ability to close escrow within fourteen (14) days of submission of overbid.

24   This evidence must at a minimum include a demonstration of a firm financing commitment from a

25   recognized lender and/or sufficient liquid funds on deposit, all to the satisfaction of the Trustee.

26         4.     All overbids for the Property must provide for payment of the entire purchase price at

27   the close of escrow.

28         5.     Any overbids shall offer to purchase the Property on a "as-is - where is" basis and

1   shall contain no conditions, contingencies or addendum in addition to those contained in the terms

2   agreed to between Trustee and Buyer and presented to this Court.

3          6.       All due diligence investigations shall be conducted prior to the sale hearing.

4   Overbidders are advised to carefully review all the documentation, including but not limited to the

5   attachments in the Counter offer, Exhibit A.

6          7.       At the conclusion of the hearing on the Motion, the Court shall determine the highest

7   and best offer for the Property, and the Trustee shall proceed to consummate the sale of the Property

8   in accordance with such offer to the highest bidder without further notice to creditors or hearing

9   before this Court.

10         8.       The overbidder's deposit is non-refundable in the event that Court confirms the sale

11  but, for any reason whatsoever, the overbidder fails to close the sale timely.  The overbidding party

12  will be bound by all of the terms of sale proposed in this Motion (as incorporated by reference in the

13  sales contract) except as to price, without contingencies of any kind, including financing

14  contingencies, and shall close the escrow no more than fourteen (14) days after the entry of the order

15  approving the Motion.

16         9.       The Trustee also proposes that the Court confirm a backup buyer so that, in the event

17  that the successful overbidder does not close within fourteen (14) days after the entry of the order

18  approving the Motion, the Trustee may retain the deposit of the original successful buyer as

19  liquidated damages and sell the Property to the back-up buyer for the amount of such back-up buyer's

20  last bid.

21         10.      The Trustee also seeks a ruling that the party to whom the Court confirms the sale and

22  any backup buyers are good faith purchasers for purposes of 11 U.S.C. §363(m).

### III.

### OUTSTANDING UNDISPUTED ENCUMBRANCES AND INTERESTS

A.       360 N. Highland Avenue, Los Angeles, California 90036

| Creditor | Lien and Judgment Amount | Lien or Abstract Recording Date |
|---|---|---|
| Los Angeles County | To be determined at closing | N/A |

| | | |
|---|---|---|
| Property Tax 2016-2017 | | |
| Los Angeles County Property Tax 2015-2016 | To be determined at closing | N/A |
| The Evergreen Advantage, LLC | $5,885,255 (estimated) | March 31, 2016 (16-355773) |
| | | |

A true and correct copy of the Preliminary Title Report for the Property is attached to the Declaration of Carolyn Dye as **Exhibit "C."**

The sales price will be sufficient to pay in full through escrow the undisputed real property taxes, including all penalties, and all consensual liens recorded against the Property. Liability for property taxes arising in the 2016-2017 tax year shall be prorated between the Trustee and the Buyer.

## IV.

## THE COURT SHOULD APPROVE THE PROPOSED SALE AS

## BEING IN THE BEST INTEREST OF THE ESTATE

Section 363(b)(1) of the Bankruptcy Code permits a trustee to sell property of the estate other than in the ordinary course of business after notice and a hearing.

The standard to be applied in determining whether sales should be authorized under 11 U.S.C. §363(b)(1) is whether such sale is in the best interests of the estate and the price is fair and reasonable. See generally, In re Huntington, Ltd., 654 F.2d 578 (9th Cir. 1974); In re Equity Funding Corp., 492 F.2d 793 (9th Cir. 1974); In re Canyon Partnership, 55 B.R. 520 (Bankr. S.D. Cal. 1985). The trustee is given substantial discretion in this regard. Id. Further, the Court has broad discretion with respect to matters under §363(b). See Big Shanty Land Corporation v. Comer Properties, Inc., 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985). The Trustee has marketed the Property in order to create a fund from which to pay general unsecured creditors and administrative expenses. Trustee believes that the proposed sale is, therefore, in the best interest of the creditors of this estate.

1    The Property has been actively marketed by a well-known real estate companies, Coldwell

2    Banker and Major Properties.  The Property has been listed on the Multi-Regional Multiple Listing

3    Service.  (See Declaration of Jeff Luster included herewith.)

4    Based on the Trustee's reasonable business judgment, Trustee believes that the sale to the

5    proposed Buyer and/or overbidder(s) is the highest and best available price for the Property.  The sale

6    will net the estate at least an estimated $1,554,475 and, more likely, $1,754,475 (assuming that we do

7    not have to pay a broker on behalf of the buyer), prior to the payment of capital gains taxes that are

8    estimated to be $1,036,000.  Thus, the sale will permit the Trustee to make a substantial distribution

9    to creditors after expenses.

10    As set forth in Trustee's declaration, the price being paid by the Buyer is the highest and best

11    price available at present.  The sale is subject to overbid.  Thus, there can be no serious question that

12    the sale is fair and reasonable.

13

14    **V.**

15    **THE BUYER IS A GOOD-FAITH PURCHASER**

16    **UNDER 11 U.S.C. §363(m)**

17    The proposed sale is in good faith.  The good faith requirement focuses principally on the

18    disclosure of all material sale terms in the absence of fraud or collusion.  In re Abbotts Gary's of

19    Pennsylvania, 788 F.2d 143, 149 (3rd Cir. 1996).  See also In re Apex Oil Company, 92 B.R. 847,

20    869-71 (Bankr. E.D. Mo. 1988).  The Motion discloses all material sale terms.  To the best of

21    Trustee's knowledge the proposed Buyer of the Property has no connection with the Debtors.  The

22    proposed Buyer has no connection to Trustee or her professionals and the sale is being consummated

23    as an "arms-length" transactions.  As such, the Trustee respectfully requests that the Court find the

24    buyer to be a "good faith purchaser" pursuant to 11 U.S.C. §363(m).

25    Typically, lack of good faith is shown by fraud, collusion between the purchaser and other

26    bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.  Ewell v.

27    Diebert (In re Ewell), 958 F.2d 276, 281 (9th Cir. 1992).  In this case, there has been neither fraud

28    nor collusion.  The Trustee properly employed a real estate broker and has actively marketed the

1  Property.  The Trustee has received other offers for the Property, but believes the offer from the

2  Buyer is the best achievable.  Thus, there has been no fraud, or collusion and the Trustee believes that

3  this offer is the highest and best price available at the present time.

4

5                                                    **VI.**

6                                              **CONCLUSION**

7           Based on the foregoing, the Trustee respectfully requests that this Court issue an order:

8           1.       Approving the proposed sale of the Property on the terms and conditions set forth in

9  the attached purchase agreements free and clear of any liens, encumbrances, claims and interests;

10          2.       Authorizing Trustee to pay customary and usual closing costs, and a six percent (6%)

11 commission to the Brokers and Buyer's broker from the proceeds of the sales and approving the other

12 disbursements described herein from escrow;

13          3.       Authorizing Trustee to pay the accrued property taxes and the Evergreen Advantage,

14 LLC Lien;

15          4.       Authorizing Trustee to execute any and all documents as may be reasonable and

16 necessary to consummate the proposed sale;

17          5.       Approving the overbidding procedures as described herein;

18          6.       Finding that the proposed Buyer (or the successful overbidder) is a good-faith

19 purchaser under 11 U.S.C. §363(m); and

20          7.       Finding that the 14 day stay on enforcement of the order approving the Motion is

21 waived pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure; and

22          8.       Granting such other and further relief as may be just and proper.

23

24 Dated: October 20, 2017                    DUMAS & KIM, APC

25

26                                            By: _____

27                                                James A. Dumas, Attorneys for Chapter 7
                                                  Trustee, Carolyn A. Dye
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF CAROLYN A. DYE

I, Carolyn A. Dye, declare:

1.     I am an attorney duly admitted to practice law in the State of California and before this Court.  I have personal knowledge of the facts described below and if called as a witness I could and would competently testify thereto.

2.     I am the duly appointed and acting Chapter 7 Trustee for the Debtor herein, Temple CB, LLC.

3.     I have reviewed the marketing and the offers that I have received with respect to the estate's real property situated in the City of El Monte, County of Los Angeles, and commonly described as 4350 Temple City Boulevard, El Monte, CA 91731 (APN: 8577-001-028 & 041) (the "Property").

4.     I employed Major Properties, through its agents, Jeff Luster and Rene Mexia, and Coldwell Banker through its agent, William Friedman, (collectively the "Brokers") to market and sell the Property.  The sales price was based on the Brokers' assessment of the fair market value of the Property.

5.     Based on my business judgment and on the information I have obtained from my Brokers, I believe that the offer received from the Buyer is the best and highest price presently available for the Property.  I did receive other offers and believe there may be other bidders at the hearing.  Although there may be overbidders based on interest expressed in the Property, at the time I had the offer in hand, I believed the Buyer was the best based on price, conditions to closing and qualification.

6.     Attached to the Motion as **Exhibit "A"** and incorporated herein by reference is a true and correct copy of the Counter Offer executed by the parties.

7.     Attached to the Motion as **Exhibit "B"** and incorporated herein by reference is the Assignment Agreement executed by the parties.

8.     Attached to the Motion as **Exhibit "C"** and incorporated herein by reference is the Preliminary Title Report for the Property.

9.     To the best of my knowledge, the Buyer has no connection to me or my professionals.

10

1    As such, the sale is an arms-length transaction and I am asking for a good faith purchaser section

2    363(m) finding in my Motion.  Paragraph E of Section II of the Motion provides that this sale is

3    subject to overbids and to approval of the Bankruptcy Court and the proposed Buyer has been made

4    aware of these conditions.

5         10.    Based on the information available to me, I also believe that the proposed Buyer of the

6    Property has no relationship with the Debtor.

7         I declare under penalty of perjury under the laws of the United States of America that the

8    foregoing is true and correct.

9         Executed this the 20th day of October, 2017, at Los Angeles, California.

10

11

12         Carolyn A. Dye

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

# EXHIBIT "A"

## COUNTER-OFFER

This agreement (the "Agreement" or "Counter-Offer") is intended to set forth the terms and conditions of a contract for the purchase by and sale to TB Holdings LLC Pension Plan, and / or Assigns (the "Buyer") from Carolyn A. Dye (the "Seller" or "Trustee"), solely in her capacity as the duly appointed, qualified, and acting chapter 7 trustee for the estate of Temple CB, LLC ("the "Debtor"), of the real property more commonly known as 4350 Temple City Blvd, El Monte, California (the "Property"). When executed below, this Agreement will constitute conclusive evidence and the exclusive terms and conditions of the contract for such purchase and sale (the "Sale") of the Property and will supersede and replace in its entirety Letter of Intent and all attachments dated September 11, 2017 (the "Offer") and any oral or written negotiations since the Offer.

**PURCHASE PRICE; DEPOSIT; ESCROW.** The purchase price for the Property shall be $8,000,000 (the "Purchase Price"). Buyer shall make an initial deposit of $240,000 (the "Initial Deposit") in the form of cashier's check or wire transfer made payable to "A&A Escrow Services, Inc." (the "Escrow Holder") which shall be delivered to A&A Escrow Services, Inc., 415 N Crescent Drive, Suite 320, Beverly Hills, California 90210, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement.

**FINANCIAL WHEREWITHAL.** Buyer shall deliver to the Seller, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement, proof of committed funds available to Buyer sufficient to enable Buyer to consummate the acquisition contemplated herein, which proof shall be in the form of a letter of credit, loan commitment, or other form acceptable to Seller in Seller's sole discretion. In the event that either (i) Buyer fails timely to provide any such proof, or (ii) Seller determines, in Seller's sole discretion, that any proof of funds provided to Seller by Buyer is unacceptable, Seller shall have the right, at Seller's option, to provide written notice to Buyer that this Counter-Offer is terminated. In the event that Seller exercises such termination right, this Counter-Offer shall terminate effective as of the date of Seller's written notice to Buyer, whereupon the Initial Deposit (if theretofore deposited with the Escrow Holder) shall be returned to Buyer and Buyer and Seller shall each be relieved of any further obligations hereunder.

**ESCROW INSTRUCTIONS.** Escrow instructions corresponding to the terms of this Agreement shall be provided by the Escrow Holder and signed by the parties within five (5) business days of the date of Buyer's and Seller's receipt of said escrow instructions. Buyer and Seller shall deposit such documents and instruments with the Escrow Holder as and when reasonably required to complete the sale. Buyer shall be free to assign this Agreement to another person or entity (the "Assignee") subject to Seller's prior review and written approval (which approval Seller may grant or withhold in his sole discretion), but Buyer shall

remain liable hereunder, together with such Assignee, in the event that such Assignee fails to perform any of Buyer's obligations hereunder.

**BUYER'S DUE DILIGENCE, AND CANCELLATION RIGHT.** Buyer shall have until October 15, 2017 to perform, complete, and satisfy all contingencies, inspections, investigations, tests and reviews of reports, and to complete all due diligence which Buyer desires for the Sale of the Property, including, but not limited to and performing and completing any geological, soil, structural, environmental, or other tests, inspections, and investigations desire by Buyer. Buyer may, not later than October 15, 2017, the diligence period, provide Seller written notice of Buyer's election to withdraw from this Agreement because of Buyer's inability to complete or dissatisfaction with the results of any of those matters (the "Notice of Cancellation"), in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit. If Buyer fails to give such Notice of Cancellation within such due diligence period, all such contingencies shall be automatically removed and Buyer's obligation to proceed shall be non-contingent except as provided herein for (i) Buyer's review of a preliminary title report and underlying documents respecting the title to the Property (as set forth below), and (ii) Bankruptcy Court approval of this Agreement and the Sale (as set forth below).

**TITLE; TITLE INSURANCE.** Within three (3) business days after acceptance of this Agreement, First American Title Company or such other title company of Seller's choice (the "Title Company") will be instructed to provide a preliminary report of the condition of title to the Property, including copies of underlying documents referred to in Schedule B thereof, for Buyer's review. Buyer shall have three (3) business days after receipt of the preliminary title report and underlying documents in which to provide Seller written notice (the "Notice of Title Disapproval") that Buyer disapproves the condition of title with respect to a material matter(s) that interfere with the use or marketability of the Property for the purpose for which it is currently used or intended to be used. Such notice must refer to the specific exception(s) in Schedule B of the preliminary title report and the specific underlying document(s) which are the basis for Buyer's disapproval. Within five (5) business days after receipt of the Notice of title Disapproval, Seller may, in Seller's sole discretion, either (i) cancel this Agreement and the Sale, in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of the Initial Deposit, or (ii) elect to correct the item(s) that were disapproved by Buyer, in which event the Sale shall proceed. Seller may correct such item by any means that will result in the Title Company either removing the disapproved exception(s) from the preliminary title report, providing title insurance coverage by endorsement against such exception(s), or providing that the order approving the Sale entered by the Bankruptcy Court shall resolve such exception in a manner acceptable to Buyer. At the close of the Sale, Seller shall convey and Buyer shall accept title to the Property as shown in Schedule B of the preliminary title report, subject to any corrections as in this paragraph above, free and clear of all monetary liens, subject to the terms of the Agreement and the order approving the Sale. Seller shall pay the costs of a CLTA Standard Owner's policy of title insurance.

Page 2 of 13

**REMOVAL OF CONTINGENCIES; COURT CONFIRMATION; CLOSING; DELIVERY OF POSSESSION.** If Buyer does not give Seller written Notice of Cancellation or Notice of Title Disapproval as and when provided in this Agreement, Buyer's silence shall be deemed acceptance and Buyer shall be deemed to have satisfied and removed all of Buyer's contingencies and to proceed with the Sale. Seller shall then file a motion with the Bankruptcy Court to confirm the Sale, which sale shall be subject to qualified overbids as approved by the Bankruptcy Court. Upon such removal of contingencies, Buyer shall be unconditionally obligated to proceed with the Sale, subject only to Bankruptcy Court confirmation as set forth below. If the Bankruptcy Court confirms the Sale to Buyer, the closing shall take place as soon as practicable after entry of the order approving the Sale, but no later than the first business day after fourteen (14) calendar days following the entry of the operative order approving the Sale. The closing shall occur on the date the deed transferring the Property to Buyer is recorded with the County Recorder where the Property is located. Occupancy shall be delivered to Buyer upon Escrow Holder's confirmation of recording.

**BANKRUPTCY SALE.** Buyer acknowledges that Seller is a trustee duly appointed to administer the Debtor's bankruptcy estate, and is a party to this Agreement solely in that capacity. Seller and his brokers and agents (collectively, the "Seller's Brokers") have not and will not determine the condition or fitness for use of the Property for any particular purpose. The Sale shall be "as is," "where is," "with all faults," and with no warranty by or recourse whatsoever to Seller or Seller's Brokers herein. Transfer of the Property shall be by Quitclaim Deed. All parties acknowledge that Seller is a party to this Agreement solely in his capacity as trustee of the Debtor's estate and that in the event of any default in the performance of any of Seller's obligations under the Offer (as modified hereby) or in the event that any other claim is asserted against Seller, the Trustee, or the estate in connection with this transaction, the Trustee shall in no event have any personal liability whatsoever (whether in his individual capacity or otherwise), it being expressly understood and agreed that Buyer's sole recourse, if any, in such event shall be to the assets of the Debtor's estate.

**TAXES; PRORATIONS; COSTS OF SALE.** All real property taxes and assessments for the current tax year shown in the current County Tax Bill shall be prorated between Seller and Buyer and charged as of the closing date to the applicable accounts of Seller and Buyer. The Sale shall be free and clear of any homeowner's association assessments and all real property taxes (other than those prorated as provided above) enforceable against the Property through the closing date of the Sale. Escrow fees shall be split between Buyer and Seller in the manner customary in the County where the Property is located. Seller shall pay any real property transfer tax. Seller shall pay the cost of a Natural Hazard Disclosure Report, from a vendor selected by Seller, to be furnished to Buyer through escrow. Buyer shall pay and have sole responsibility for compliance with any requirements imposed on the Property or this Sale by any governmental agency(ies), including compliance with any applicable governmental retrofit requirements. Buyer shall pay the cost of recording the deed. Buyer and Seller shall each pay their own expenses of every other type except as specifically provided in this Agreement.

**BANKRUPTCY COURT APPROVAL; OVERBIDDING.** The Sale is subject to notice to creditors, approval by the Bankruptcy Court, and higher and better qualified bids received by

Seller through and including the Bankruptcy Court hearing to confirm the Sale. Payment of any and all real estate brokers' commissions is also subject to notice to creditors and approval by the Bankruptcy Court. Buyer acknowledges and agrees that Seller may not seek to obtain the Bankruptcy Court's approval if Seller has determined that it would be in the best interest of the bankruptcy estate not to do so.

Buyer will be deemed the Stalking Horse Buyer buyer for the Property subject to overbid. The Trustee further agrees upon the removal of all contingencies by Buyer to promptly notice a hearing and to take all additional steps necessary to obtain the entry of an order and any other necessary approvals from the Bankruptcy Court approving this Agreement and the Sale, free and clear of all liens, claims, interests and encumbrances, and the treatment of Buyer as a purchaser in good faith under Section363(m) of the Bankruptcy Code

**BROKERS.** Seller is represented by Major Properties and Coldwell Banker. Buyer is represented by the Law office of Daniel J. Janecak. Subject to Bankruptcy Court approval, Seller will pay a real estate broker's commission aggregating 5% of net sales price of the Property to the Brokers as follows: 1.25% to Major Properties, 1.25% to Coldwell Banker and 2.5% to the Law Office of Daniel J. Janecak in connection with the closing of the Sale. Seller's Brokers and Buyer's Brokers are collectively referred to herein as the "Brokers". No commission or compensation shall be due or payable to Brokers in connection with this Agreement or Sale except from the cash proceeds of an actual Sale of the Property that closes to Buyer. Buyer hereby represents and warrants that, other than the Brokers, Buyer has not dealt with any broker, finder, or other person entitled to any fee, commission, or other compensation in connection with the Sale and Buyer shall indemnify, defend, protect, and hold Seller and the related bankruptcy estate harmless of, from, and against any claims, demands, actions, causes of action, losses, liabilities, costs, and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Seller may suffer or incur in the event that any claims for any such fees, commissions, or other compensation of any kind are hereafter asserted.

**MATERIAL CHANGE OF CONDITION.** In the event of any material change in the condition of the Property after the date of acceptance of this Counter-Offer, if Buyer demands repair of any resulting actual damage to the Property, Seller may, at Seller's sole option: (I) elect to terminate this Agreement, in which event Buyer's and Seller's obligations to buy or sell shall terminate and the Initial Deposit shall be refunded to Buyer; or (ii) make required repairs at the bankruptcy estate's expense; or (iii) assign any insurance proceeds for the damage to the Property to Buyer as of the close of the Sale; or (iv) credit the cost of such repairs to Buyer through escrow, it being agreed that in the event that Seller elects and complies with subpart (b), (c), or (d) of this paragraph, Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property.

Page 4 of 13

**REMEDY FOR BUYER'S OR SELLER'S FAILURE TO CLOSE.** Buyer's sole remedy in the event that the Sale fails to close as a result of Seller's inability or failure to close for any reason, including but not limited to the reason of failure to obtain approval of the Sale by the Bankruptcy Court, shall be the mutual release of Buyer's and Seller's obligations to buy or sell and a full refund of the Initial Deposit (plus any increase thereof by Buyer).  In the event Buyer fails to close the Sale for any reason other than Seller's default, after Buyer's contingencies have been removed as under this Agreement, Buyer's Initial Deposit (plus any increase thereof by Buyer) shall be paid over to Seller and retained by Seller as liquidated damages without further legal action.  If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than three percent (3%) of the Purchase Price.  This provision shall apply equally to the Initial Deposit (and any increase thereof by Buyer).

_____ [Buyer's Initials]

**BANKRUPTCY COURT JURISDICTION.** The United States Bankruptcy Court for the Central District of California, Los Angeles Division shall have sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement and Buyer hereby consents and submits to such exclusive jurisdiction. This Agreement shall be interpreted and enforced pursuant to the laws of the State of California, the United States of America, and title 11 of the United States Code.

**"AS-IS," "WHERE-IS" CONDITION; NO WARRANTIES.** Buyer acknowledges and agrees that, to the maximum extent permitted by law, the sale contemplated by this Agreement is made "as-is," "where-is," and "with all faults," except as specifically provided in this Agreement. Seller and Seller's Brokers have not made, do not make, and specifically negate and disclaim any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever, whether express or implied, oral or written, concerning or respecting (i) the value of the Property; (ii) the income to be derived from the Property; (iii) the suitability of the Property, or lack thereof for any activity or use which Buyer may intend to conduct thereon, including any possibilities or limitations for future development; (iv) the habitability, merchantability, marketability, profitability, or fitness for a particular purpose, of the Property, or lack thereof; (v) the manner, quality, state of repair, or lack of repair of the Property; (vi) the nature, quality, or condition of the Property, or any portion, system, or component thereof, including without limitation, water, soil, and geology; (vii) the compliance of the Property or its operation, or lack thereof, with any laws, ordinances, regulations, rules, or orders of any applicable governmental authority or body; (viii) the manner or quality of engineering, design, construction or materials, if any, incorporated into the Property; (ix) the compliance or lack of compliance with any land use, building and safety, or other laws, ordinances, regulations, rules, orders, or other requirements imposed or enforced by any governmental or non-governmental body, including without limitation the Americans with Disabilities Act of 1990; (x) the presence or absence at, on, under, or adjacent to the Property, of materials described as "hazardous substances, hazardous materials, or toxic substances" or by similar terms under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Toxic Substance Control Act (15 U.S.C. § 2601, et seq.), the Clean Water Act (33 U.S.C. § 1251, et seq.), California Health and Safety Code §§ 25117 or 25316, or other statutes and laws, all as amended and including all regulations issued thereunder; (xi) the content, completeness or accuracy of any due diligence materials or preliminary report regarding title to the Property; (xii) the conformity or lack of conformity of the improvements to any plans or specifications for the Property, including any plans and specifications that may have been or may be provided to Buyer; (xiii) the conformity or lack of conformity of the Property to past, current, or future applicable zoning or building requirements; (xiv) any deficiency of any undershoring, drainage, or other aspects, systems, or components of or affecting the Property; (xv) the fact, if applicable, that all or a portion of the Property may be located on or near any natural hazard zone as determined by any governmental agency or body; (xvi) the existence of vested land use,

Page 6 of 13

zoning, or building entitlements affecting the Property or any other property; or (xvii) any other matter. Without in any manner limiting the foregoing, Buyer hereby acknowledges and agrees that (i) Seller's Brokers have provided (and will hereafter provide) to Buyer various materials and information relating to the Property, including, without limitation, information and materials relating to the condition of the Property, and (ii) all such materials and information so provided to Buyer by Seller's Brokers shall, for all purposes of this Agreement, be deemed to have been disclosed to Buyer by the Seller, as well.

**BROKERS.**  Seller's Brokers herein have not and will not perform any inspections, investigations, or due diligence on behalf of Buyer unless otherwise specified herein. Buyer is informed that Buyer must arrange for any inspections and investigations desired by Buyer utilizing suitable third party professionals selected and compensated by Buyer.  In no event shall Seller have any liability or responsibility for any representation, warranty, statement made, or information furnished by Seller's Brokers, or any other person or entity, concerning the Property, this Agreement, or any other matter, unless expressly set forth in writing and signed personally by Seller.

**OPPORTUNITY TO INSPECT; BUYER'S SOLE RELIANCE.**  Buyer represents, warrants, acknowledges, and agrees that Buyer has been given the opportunity to inspect and investigate the Property and all other facts and circumstances deemed by Buyer relevant and significant, and to review information and documentation affecting the Property.  In deciding to proceed with the Sale, Buyer is relying solely on Buyer's own inspections and investigation of the Property (including by any outside professionals whom Buyer has elected to engage for such services) and review of such information and documentation, and not on any information provided or to be provided by Seller.  Buyer further acknowledges and agrees that any information made available to Buyer or provided or to be provided by or on behalf of Seller with respect to the Property was obtained from a variety of sources and that neither Seller nor Seller's Brokers nor any other person has made or makes any representations as to the accuracy or completeness of such information.  Buyer hereby fully and irrevocably releases all such sources and preparers of information and documentation affecting the Property which were retained or engaged by Seller or Seller's Brokers from any and all claims that Buyer may now or hereafter have against such sources and preparers of information, for any costs, expenses, losses, liabilities, damages, demands, actions, or causes of action arising from any such information or documentation.  NEITHER SELLER NOR BROKERS HAVE PROVIDED OR WILL PROVIDE ANY LEGAL OR TAX ADVICE TO BUYER.  Buyer is informed that Buyer must obtain any such advice, if desired by Buyer, from independent professionals selected and engaged by Buyer.

Page 7 of 13

**PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL
INSPECTIONS AND INVESTIGATIONS.**

     A.    BUYER SHALL CONDUCT THOROUGH PHYSICAL, GEOLOGICAL,
PEST CONTROL, ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS OF
THE PROPERTY AS MAY BE DETERMINED BY BUYER, THROUGH QUALIFIED
PROFESSIONALS SELECTED BY BUYER.  Seller and Seller's Brokers strongly
recommend that Buyer fully exercise and not waive such inspections and investigations.

     B.    Buyer shall select and employ, at Buyer's sole expense, a licensed
engineer(s), architect(s), contractor(s), geologist(s), pest control licensee(s),
environmental consultant(s), or other qualified professional(s), to make inspection(s)
and investigations of the Property, including, but not limited to, (i) its general structure,
plumbing, heating, air conditioning (if any), electrical system, built-in appliances,
cesspool/sewer/septic system, well, roof, soils, foundation, mechanical systems, pool,
spa, related equipment and filters, sprinklers, and those other matters affecting the
desirability of the Property (all if and only to the extent any such structures, systems,
and components are presently a part of the Property); (ii) any actual or potential wood
destroying pests or other conditions damaging to the Property or any portion thereof;
(iii) environmental hazards, substances, products, or conditions, including without
limitation, asbestos, formaldehyde, lead, lead-based paint, contaminated soil or water,
fuel, chemical storage tanks, hazardous waste, electromagnetic fields, and radon gas,
any of which may constitute a health risk; (iv) the presence or absence of any required
governmental permits, inspections, applications, approvals, and certificates of
occupancy, and compliance or lack of compliance with building codes and laws
applicable to the Property; (v) plans and specifications for the Property; (vi) all
applicable zoning, municipal, county, state, and federal, including those affecting the
past, current, or any future use of the Property; (vii) deed restrictions and other matters
of public record which may govern, restrict, condition, or prohibit the use, alteration, or
development of the Property; and (viii) generally, without limitation, any and all other
items and matters of whatsoever nature, character, or description, which Buyer deems
material to Buyer's interests, in, on, or affecting the Property, and to approve or
disapprove said inspection within the period and in the manner set forth in this
Agreement.

     **APPRAISAL.**  Buyer was previously provided a copy of Quality Appraisal Service
appraisal dated 11/23/16

**ENVIORNMENTAL WEBSITE INFORMATION.  Buyer was previously provided with the following website information:**

https://geotracker.waterboards.ca.gov/

http://www.envirostor.dtsc.ca.gov/public/profile_report.asp?global_id=60001065

http://www.envirostor.dtsc.ca.gov/public/final_documents2.asp?global_id=60001065&doc_id=60254714

https://yosemite.epa.gov/r9/sfund/r9sfdocw.nsf/ViewByEPAID/CAD980677355

https://cfpub.epa.gov/compliance/resources/policies/cleanup/superfund/index.cfm?action=3&sub_id=118

http://www.waterboards.ca.gov/water_issues/programs/grants_loans/proposition1.shtml

http://www.dtsc.ca.gov/SiteCleanup/Brownfields/


**Important information can be obtained from:**


Christine Bucklin, P.G at the DTCS

Geological Services Branch, Unit 3

Department of Toxic Substances Control

5796 Corporate Avenue

Cypress, CA 90630

(714) 484-5393 phone


Additional information can be obtained from the coordinator for the EPA is Mariam Fawaz
Mariam@epa.gov


Page 9 of 13

**The following are attached to this counteroffer:**

Declaration with Exhibit "A" of Elaine Hsin Jeng, city engineer, dated July 5, 2017

Email dated July 6, 2017 from Carolyn Dye

Exhibit 4 – letter dated May 19, 2017 from Jeremy Squire of Murex Enviornmental consisting of 7 pages along with Engineering Opinion of Probable Remediation Costs consisting of 3 pages.

Letter from City of El Monte dated August 17, 2017

Revised Vapor Intrusion Investigation Work Plan dated June 23, 2016

Letter dated July 26, 2017 from Department of Toxic Substance Control

**ENVIRONMENTAL RELEASE OF SELLER AND BROKERS.** Buyer understands that Seller and Brokers (including their agents) have not made any representations or warranties regarding the presence of any hazardous materials in, on, under or about the Property or the Property's compliance with any applicable environmental laws (except as expressly stated herein).   Upon the closing of the Sale to Buyer, Buyer covenants and agrees that Buyer shall release Seller and Brokers from and against any and all causes of action, claims and damages (whether known or unknown as of the date hereof) with respect to the presence of any hazardous materials in, on, under or about the Property that Buyer may have against Seller and/or Brokers with respect to same and that Seller and Brokers shall have no liability to Buyer with respect to same.  This provision shall survive the closing of the Sale to Buyer.

BREAK UP FEE

**In the event that Buyer is not the successful bidder and upon the closing of the sale to the overbidder, Buyer will be entitled to receive its  verified, reasonable and actual costs incurred in connection with its due diligence expenses, not to exceed $50,000.**

Page 10 of 13

**COMPLETE AGREEMENT; NO OTHER REPRESENTATIONS OR WARRANTIES.**
Seller shall not be liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property, or the operation thereof, furnished by any real estate broker, agent, employee, contractor, or other person. Buyer further acknowledges and agrees Seller has no obligations to make repairs, replacements, or improvements to the Property except as may otherwise be expressly stated herein.  Without limiting any other provision hereof,  Buyer represents, warrants, and covenants to Seller that, except for Seller's express representations and warranties specified in this Agreement, Buyer is relying solely upon Buyer's own investigation of the Property.

**WRITTEN AFFIRMATION OF SELLER REQUIRED.**  Buyer understands that Seller may continue to receive and respond to other offers on the Property and may be making several counter-offers concurrently containing the same or different terms.  This Counter-Offer shall not be binding until accepted by Buyer and executed by Buyer and Seller on the signature page below; and then approved by Seller, in Seller's sole discretion, in the form of the Seller's "Affirmation of Agreement" attached hereto as Exhibit "A" which, if so executed by Seller, will constitute Seller's agreement that Seller will sell the Property to Buyer, subject to Bankruptcy Court approval, the rights of any overbidding parties, and the terms and conditions of this Agreement.  Buyer further acknowledges that it would be imprudent and unrealistic to rely upon the expectation of entering into a binding agreement regarding the subject matter of this Counter-Offer prior to receipt of Seller's Affirmation of Agreement, and further represents to Seller that any efforts to complete due diligence, to negotiate or to perform any of the obligations provided herein shall not be considered as evidence of binding intent without Seller's Affirmation of Agreement, and understands that BUYER'S ACCEPTANCE HEREOF SHALL HAVE NO FORCE OR EFFECT PRIOR TO BUYER'S RECEIPT OF SUCH AFFIRMATION OF AGREEMENT SIGNED BY SELLER.

**ATTORNEYS' FEES.**  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation,

Page 11 of 13

all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

**ALL CASH TRANSACTION.** Buyer is paying all cash. Buyer waives a financing contingency

**EXPIRATION OF COUNTER-OFFER.** This Counter-Offer shall expire if not accepted by Buyer by delivering a copy hereof, fully signed and initialed by Buyer, to Seller, on or before close of business September 14, 2017. Such acceptance shall nevertheless be subject to the receipt of Seller's Affirmation of Agreement.

**AGREED AND ACCEPTED:**

BUYER:

Dated: _____09/12/2017_____

By: _____ Christopher M. Craig, LLM, MBA, CIRA its Trustee
         TB Holdings LLC Pension Plan, and / or Assigns

SELLER (subject to execution of Seller's Affirmation of Agreement):

Dated: _____

By: _____
         Carolyn A. Dye solely in her capacity as Chapter 7 Trustee for Temple CB, LLC

## EXHIBIT "A"

### SELLER'S AFFIRMATION OF AGREEMENT

Seller hereby acknowledges Buyer's acceptance of the foregoing Counter-Offer and affirmatively agrees to sell the Property to Buyer on the terms and conditions of the foregoing Agreement, but subject to Bankruptcy Court approval and any qualified overbidders. Seller shall revoke any other outstanding Counter-Offers made to other prospective buyers or make the same subject and subordinate to this Agreement.

SELLER

Dated: _9/12/17_

By: _____

Caorlyn A. Dye, solely in her capacity as Chapter 7 Trustee for Temple CB, LLC

25

# DECLARATION OF ELAINE HSIN JENG

I, ELAINE HSIN JENG, state and declare:

1.      I am a resident of Los Angeles County, California and I am more than 18 years of age and if called upon I can testify based upon personal knowledge as to the matters set forth below in this Declaration.

2.      I am a registered professional civil engineer in the State of California and in May 2015, I was appointed by the City Manager of the City of El Monte (the "City") to serve as the City Engineer of the City, and since May 2015 I have served as the Director of Public Works and Utility Services for the City. I am also responsible for the operations of the City Water Department, which provides domestic drinking water to four thousand (4,000) residential and commercial service connections in the City.

3.      Since shortly after the time of beginning my employment with the City, I have become aware of a number of public health and safety concerns to the City, which are focused on or near the real property located at 4350 Temple City Boulevard, El Monte, California (the "Property"). The Property is also known as the former "Crown City Plating" site.

4.      The Property is located in the El Monte Operable Unit, and the El Monte Operable Unit has been identified as a National Priority Site by the United States Environmental Protection Agency ("USEPA") as a threatened groundwater resource, and the USEPA has ordered various Responsible Parties to take certain specific actions to prevent the further spread of contamination of hazardous substances into local El Monte groundwater resources. The City Water Department obtains 100% of the water which it serves to its customers from groundwater.

5.      I have been informed by a number of other public officials, including without limitation representatives of the State of California Department Toxic Substances Control Board ("State DTSC"), the State of California Water Resources Control Board Division of Drinking Water ("State DDW") and the USEPA that the Property is likely a source of unauthorized releases of chemicals of concern and hazardous substances to the environment and local groundwater resources of the El Monte Operable Unit, such as volatile organic compounds ("VOCs") and heavy metals, including Chromium -6 ("Cr6"), and as such, continuing and uncontrolled release of

1  Cr6  to groundwater in particular, poses special  problems and concerns to the City and the continued

2  safe operation of the City Water Department and the protection of its customers, for which I have

3  operational responsibilities.

4      6.    Pending the completion of certain environmental site investigations of the Property,

5  the City has not authorized any lawful occupancy of the Property except for the limited purpose of

6  conducting environmental site investigations and performing specific items of remedial work which

7  has first been approved by and supervised by an environmental resource trustee agency, such as State

8  DTSC or the State of California Regional Water Control Board ("Regional Board").

9      7.    It is my understanding that  there are a number of reasons supporting the  action by

10  the  City  described  in  Paragraph 6 of this Declaration,  including not  only  the  very

11  serious  environmental  safety  challenges  which  afflict  the Property  in its  present  condition and

12  prevent  its  lawful  occupancy,  and  also  the  fact  that  there  is  no  operational  fire  suppression

13  system  functioning  in  any  of  the  more  than  175,000  square  feet  of  former  electro-plating

14  manufacturing  buildings on the Property.

15     8.    I am informed by the Planning Director of the City of El Monte, that the City has not

16  issued any certificate of occupancy which authorizes the lawful occupancy of the Property pursuant to

17  El Monte Municipal Code Section 17.16.010, to either the owner of the Property or to any occupant

18  in possession of the Property, except for the limited purposes described in Paragraph 6 and subject to

19  the facts set forth in the next Paragraph of this Declaration.

20     9.    I am also informed by the Chief Building Official of the City of El Monte that the City

21  issued a temporary electric power permit to the owner of the Property to conduct certain specific and

22  limited  environment  remedial  work  approved  by  State  DTSC  on  the  Property,  which  temporary

23  electric power permit was never lawfully activated by the owner or any occupant of the Property, and

24  which City permit has since expired as of December 31, 2016 by the express terms of the City

25  temporary power permit.

26     10.   As of the date of this Declaration, I am not aware that the environmental investigation

27  work which was to be conducted on the Property using temporary electric power authorized under the

28  City temporary electric power permit has been performed.

2   DECLARATION OF ELAINE HSIN JENG

11.    At the present time, the City and its Water Department are preparing a grant application seeking a potential award of funds under State Ballot Proposition 1 (2014 California Water Bonds) in order for the City to have the funds necessary to undertake certain environmental investigation and remedial action as relates to the protection of groundwater resources from Cr6 contamination.

12.    As part of the preparation of the City grant application described in Paragraph 11 of this Declaration, the City has obtained an estimate of the cost to conduct further environmental investigation and remediation of the Property in light of the information presently available to the USEPA, State DTSC, the Regional Board and the City, with respect to the potential hazards posed by the Property to local groundwater resources. Such estimate of costs is attached hereto to this Declaration as **Exhibit "A,"** which is incorporated herein by this reference.

I hereby declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this **05** th day of July, 2017 at El Monte, California

By: _____

Elaine Hsin Jeng
Director of Public Works
and Utility Services, City of El Monte

3    **DECLARATION OF ELAINE HSIN JENG**

1

**EXHIBIT "A"**

2   Cost estimate of the cost to conduct further environmental investigation and remediation
of the Property in light of the information presently available to the UESPA, State
3   DTSC, the Regional Board and the City

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4        **DECLARATION OF ELAINE HSIN JENG**

# EXHIBIT "A" TO DECLARATION OF ELAINE HSIN JENG

| Priority Ordering | Activity Type | Activity Description | Preliminary Cost Estimate |
|---|---|---|---|
| 1 | Implentation (DTSC Scope Item) | Destruction of 800-ft inactive production well CCP-1 | $50,000 |
| 2 | Implentation (DTSC Scope Item) | Removal of 10,000 gallons of contaminated water within piping and plating infrastructure (e.g., sumps and clarifiers) | $300,000 |
| 3 | Planning | Development of Engineering Evaluation/Cost Analysis (EE/CA)Workplan based on detailed review of available agency files and building plans | $50,000 |
| 4 | Implentation (DTSC Scope Item) | Installation of 10 groundwater monitoring wells to 125 feet bgs using Sonic drilling methodology, soil sampling for VOCs and metals at 10-ft intervals | $500,000 |
| 5 | Implentation (DTSC Scope Item) | Soil sampling for VOCs and metals at 5-ft intervals from 30 soil borings completed to 50 feet bgs using direct push drilling methodology | $150,000 |
| 6 | Implentation (DTSC Scope Item) | Install 15 soil vapor probe clusters to 50 feet bgs with 4 probes per cluster at 5 feet, 15 feet, 30 feet, and 50 feet bgs, soil sampling for VOCs and metals at 5-ft intervals | $170,000 |
| 7 | Implentation (DTSC Scope Item) | Removal of 20,000 sq ft of metals-impacted concrete, plating clarifier and sumps | $170,000 |
| 8 | Implentation (DTSC Scope Item) | Removal of 4,000 yards of contaminated soil impacted with metals *Costs based on Caltrans classification (RCRA Haz classification will increase disposal costs significantly) | $1,200,000 |
| 9 | Implentation | Building demolition, abatement, and re-paving (cost detail can be provided upon request) | $14,000,000 |
| 10 | Planning | Development of EE/CA Report | $75,000 |
| 11 | Implentation | DTSC-approved soil vapor extraction pilot test | $350,000 |
| 12 | Planning | Soil vapor extraction design | $75,000 |
| 13 | Implentation | Soil vapor extraction system implementation | $750,000 |
| 14 | Implentation | Groundwater remediation – enhanced in-situ bio remediation | $3,300,000 |
| TOTAL PRELIMINARY COST ESTIMATE - SCENARIO 1 * - EXCLUDES SCOPE ITEM 9 | | | $7,140,000 |
| TOTAL PRELIMINARY COST ESTIMATE - SCENARIO 2 ** - EXCLUDES SCOPE ITEMS 7 & 8 | | | $19,770,000 |

Notes:
* Scenario 1 includes removal of plating operation/wastewater infrastructure (scope item item 7) and metals-impacted soil (scope item 8) without building demolition and abatement (scope item 9)

**Scenario 2 includes demolition and abatement of site structures, foundations, and plating operation/wastewater infrastructure and re-paving of building footprints (scope item 9 addresses scope items 7 & 8)

## Bill Friedman

**From:** "Bill Friedman" <billfried@earthlink.net>
**To:** <jeff@majorproperties.com>
**Cc:** "Rene Mexia" <rene@majorproperties.com>
**Sent:** Friday, July 07, 2017 9:38 AM
**Subject:** Fw: Temple CB / 4350 Temple

Jeff and Rene, I believe the email below also needs to be given out as a disclousure to all buyers as it discusses possible State liability. I'll ask Carolyn if it is ok for us to give it to all prospective buyers and brokers.

Bill
—— Original Message ——
**From:** Carolyn Dye
**To:** Bill Friedman ; jeff@majorproperties.com ; Rene Mexia
**Cc:** Christian T. Kim
**Sent:** Thursday, July 06, 2017 11:02 AM
**Subject:** Temple CB

Bill, Jeff and Rene, I spoke at length with the City attorney
yesterday afternoon. There are two separate contamination issues. One
is the  ground water issue. The second is the vapor intrusion issue. I
now understand the new owner can be insulated from the liability for
the groundwater problem through the EPA guidelines. The only caveat to
that is that the new owner may have to pay to seal off the open well
on the property that is the source of leaching materials into the
aquifer below.  The EPA insulation does not however, insulate from
possible state liability. The City is focused on the possible vapor
intrusion into the buildings and would like to see a vapor intrusion
installed on the property.  I did confirm that the City is pursuing a
grant from the state to address some of these issues but he was very
nonspecific and the grant proposal has not yet been submitted. I will
keep you informed as I learn new details. Carolyn

Carolyn A. Dye
Law Offices of Carolyn A. Dye
3435 Wilshire Boulevard, Suite 990
Los Angeles, CA 90010
(p) 213-368-5000
(f) 213-368-5009
cdye@cadye.com

NOTICE: This communication is intended for the use of the individual or entity to which it is addressed and may contain attorney/client information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email or by telephone and immediately delete this communication and all its attachments.

7/7/2017

In Re TEMPLE CB, LLC

MOTION TO DISMISS CHAPTER 7 CASE

2:17-bk-10301-BR

# EXHIBIT 4

to Declaration of J. Thomas Hand

MUREX
environmental, inc

May 19, 2017
File Number 1057-001-401


Temple CB
4441 Baldwin Ave, #C
El Monte, CA 91731

Attn:       Mr. Jay Hooper

Subject:    **Engineer's Opinion of Probable Site Closure Cost**
            **4350 Temple City Boulevard, El Monte, CA (Former Crown City Plating)**


Dear Mr. Hooper:

The purpose of this document is to provide an estimate of probable cost for the regulatory
closure of your environmental responsibility at the former Crown City Plating Company
(CCPC) facility in the City of El Monte, California (Site).


Murex has reviewed a large file of historical environmental documents, inspected the Site's
current condition, discussed the Site with the DTSC, and interviewed your staff.  We have
compiled the following summary to outline the steps and associated costs that are
estimated to be required as a part of achieving regulatory Site closure, including discussion
of mitigating factors such as the exclusion of CERLCA (i.e., "Superfund") liability (the
regional groundwater impacts are being managed as a Superfund site and prior site
operators have settled with the United States Environmental Protection Agency (USEPA),
making their financial contributions to the regional cleanup fund).  The following outlines
the steps necessary to achieve an acceptable condition likely to be granted a determination
of No Further Action by the environmental agency in charge, the Department of Toxic
Substances Control (DTSC), the status of each required action, and if not complete, an
estimate of the cost to complete it.


**Basis of Cost Estimate**
The following resources were used to develop the estimate of probable remediation cost;
they may be considered the bases for the selection of remedial action cleanup objectives,
remedial action alternatives, and an implementation scope.

* <u>Historical Investigation Data</u> – Soil and soil vapor data historically collected by past
  consultants (documents as provided by your office), as well as interpolation of

probable impact levels in locations where data has not yet been collected. These documents include technical reports by past consultants working for Crown City Plating, USEPA, DTSC, and Temple CB, as well as DTSC, RWQCB, and USEPA correspondence.

• Remaining Data Gaps - Isolated data gaps exist within the record of Site historical work. These include Areas of Concern (AOCs) that have not been completely investigated. Murex has made assumptions regarding the extent of impact in areas that have not yet been characterized. Most notably, this refers to the lack of characterization of hexavalent chromium within AOC 16.

• Exclusion of Groundwater Plume – The Site lies within a "Superfund" cleanup area, where significant past releases from multiple parties in the surrounding area are being managed collectively by the United States Environmental Protection Agency (USEPA). We understand that Crown City Plating, the former Site operator, settled with the USEPA to contribute to the groundwater cleanup fund as a part of resolving their bankruptcy proceedings, which were initiated in 2008. Further, DTSC staff have repeatedly described future groundwater remediation and characterization efforts in terms of funding that would come from State and Federal sources, with no responsibility for the current Site owners. While the cleanup is expected to continue for many years, the current property owner, Temple CB, has no connection to past operations or releases, neither here at the site, nor at the many off-site contributing sites. Further, Pursuant to State's long-standing policy, owners of property with passive migration of contaminated GW do not have to actively remediate or take other environmental response actions. The original policy was outlined in DHS Policy Management Memo #90-11 dated December 7, 1990. For the purpose of this evaluation, we have excluded remediation of groundwater from the scope of responsibility.

• Regulatory Requirements – We have generally used knowledge of DTSC protocol and regulatory guidance, as well as Regional Screening Levels (RSLs), which are a guide for responsible parties evaluating the need for and completion of remediation, to estimate the extent of required cleanup activities. "Completion" will be judged as reached when the RP can demonstrate that 1) the cleanup technology has reached its practical limit, 2) that a human health risk has been abated for current and future occupants, and 3) that the residual contamination does not pose a threat to groundwater quality.

• Experience - My personal experience with site assessment and cleanup actions at similar project sites with similar pollutants as a professional engineer performing environmental remediation in Southern California.

**Scope of Work**

Murex has generally laid out the steps required to reach regulatory concurrence with the completion of Site work to the point at which no further requirements remain. These steps are anticipated as follows:

1. **VOC Remediation (STAUTS - To Begin May 2017)**

   a. **SVE Pilot Test** - Perform the SVE pilot test, collect & analyze data, present report to DTSC (this task has been authorized by the owner and is beginning now). The proposed SVE well and two soil vapor monitoring wells will act as three new data points for the collection of soil matrix VOC concentrations. After the completion of the pilot test, the data will be compiled and presented in a report, along with recommended design specifications for the construction of the full-scale system.

   b. **Design Data Collection** - Perform design data collection (to address data gaps in soil matrix concentrations at depth) — for the purposes of this estimate, we are allotting budget to advance 5 additional borings by direct push to a depth of 50 ft-bgs and 4 additional borings to 100 ft-bgs). Boring logs, cross-sections, and a summary will be presented in the remedial action workplan (next step).

   c. **Design/RAW** - Design full-scale system and present Updated Site Conceptual Model/Remedial Action Workplan to DTSC. We are assuming for the purpose of this estimate that this effort covers only the design and workplan costs related to the VOCs, and that remaining issues will be either addressed separately or that a combined RAW will be prepared and those costs will be allocated in a later estimate.

   d. **Installation** - Perform permitting, install SVE wells, procure equipment/piping/vessels, and install piping, manifolds, and make electrical drops. We have conceptually assumed the use of a single SVE system, operating a total of 12 double-nested SVE wells. The system would rotate operation of wells in zones, in a "pulsed" operation, to maximize carbon filter efficiency and lower cost.

   e. **Startup & Operation** - Perform debugging, operate and maintain system for a period of approximately eighteen months. This will include electrical usage, carbon filter usage and replacement, permit-required testing, project management, correspondence with DTSC, and maintenance.

f.  SVE Closure Activities -

    i.  Rebound Testing - Based on the performance of the SVE system, once influent concentrations are reduced to asymptotic levels, a rebound test will be conducted.

    ii.  Verification Soil/Soil Vapor Sampling - After rebound testing confirms that sufficient mass has been removed, verification soil and soil vapor sampling will be conducted to confirm that VOC cleanup is complete. We assume a post-remediation investigation that includes 10 borings to 100 feet, 100 soil samples analyzed for VOCs, and the installation of quadruple nested vapor probes in half of the borings. The 20 probes will be sampled and analyzed by method TO-15.

    iii.  System Demobilization - The spent carbon from the vessels will be vacuumed out and disposed of as non-hazardous waste. The SVE system, carbon vessels, piping, and temporary electrical infrastructure will be removed from the Site.

2.  **Removal of Hazardous Materials** - Hazardous materials (other than typical asbestos, lead-based paint, universal wastes, etc.) that exist in containers, piles, residue, or other above-ground/above-slab areas should be itemized, containerized, and shipped off-site after being properly profiled for disposal according to State and Federal requirements. **STATUS - Complete, with the exception of 8 containers of hazardous materials, which are currently stored in the Maintenance Storage Shed.**

3.  **Decontamination** - Plating solutions left stained or crystalized on concrete flooring and walls should be power-washed and the wash solution captured by pump truck. These solutions can contain cyanide and hexavalent chromium. The liquid should be containerized and shipped off-site after being properly profiled for disposal according to State and Federal requirements. **STATUS - Complete.**

4.  **Closure of FTU (AOC 16) (STATUS - Pending further discussion with DTSC)** - The former Permit-by-Rule (PBR) fixed treatment unit (FTU) identified as AOC 16 will require closure. Closure of a FTU under PBR requires several steps:

    a.  Removal of all waste liquids and hazardous materials under approved profile.

    b.  Decontamination and disposal of rinsate liquids under approved profile.

    c.  Line and sample box closure - collection lines associated with the FTU (intake, discharge, transfer lines, etc) must be capped under permit, the

sample box will be closed by filling with concrete, and the clarifier will be properly abandoned.

   d.  Concrete cores will be collected, crushed, and analyzed for heavy metals and cyanide.

   e.  Investigation & Soil Excavation - *See Task Items 4 and 5*

   f.  A final closure report will be submitted, stamped by a registered engineer.

5. <u>Additional Characterization of Plating Lines/FTU</u> **(Status - Pending further discussion with DTSC)** - Initial characterization activities performed by AMEC-Geomatrix in 2010-2012 indicated near-surface impacts from heavy metals such as hexavalent chromium, copper, and nickel. We anticipate the need to further characterize the extent of impacts from heavy metals in the vicinity of AOC 1 (Plating Line #1), AOC 5 (Plastic Plating Room), the northern portion of AOC 13 (Plating Line #6), and beneath AOC 16 (former FTU). To maximize efficiency, it is assumed that these investigations will occur in one mobilization under a single approved workplan. The steps will proceed as follows:

   a.  Preparation of characterization workplan for DTSC review, comments/comment responses, and development of a final scope of work;

   b.  Drilling, sample collection, and analysis - Assume approximately 45 borings to average depth of 30 feet, total of 90 samples analyzed for Title 22 metals plus hex chrome and cyanide, and 180 samples analyzed for total chrome, hex chrome, copper, and nickel.

   c.  Preparation of a technical report.

6. <u>Heavy Metals Remediation</u> **(STATUS - Contingent upon findings of investigation)** - We anticipate the need to excavate shallow soil at each of three AOCs to address the future risk to groundwater and meet minimum cleanup thresholds for hexavalent chromium. This will involve the following steps:

   a.  Preparation of a soil excavation workplan, including target remediation criteria.

   b.  Cutting, breaking, and segregation of concrete impacted with heavy metals.

   c.  Excavation of up to 1,000 cubic yards of non-RCRA hazardous soil.

   d.  Disposal of 100 tons of non-RCRA hazardous concrete and 1,500 tons of non-RCRA hazardous soil.

   e.  Placement and compaction of import fill, restoration of concrete slabs.

7. Human Health Risk Assessment (STATUS - Pending completion of characterization and remediation activities) - Data from the soil investigation, post-VOC remediation soil and soil vapor investigation, and from the excavation confirmation sampling will be combined into a data set and a human health risk assessment will be prepared and submitted for DTSC review.

8. Institutional Controls (STATUS - Pending completion of HHRA) - Integral to regulatory Site closure will be documentation of long-term institutional controls, which include:

   a. Protection of existing monitoring wells for DTSC/USEPA access

   b. Record deed restriction

   c. Maintain site cap

   d. DTSC O&M Plan, Ongoing Inspections and Reporting to DTSC

9. Soil Closure Report (STATUS - Pending completion of all other activities) - One the HHRA and Institutional controls are approved by DTSC, a final soil closure report will be prepared and submitted, documenting the remedial work, HHRA findings, institutional control measures, and long-term O&M plan for maintenance of the Site cap.

10. DTSC Oversight (STATUS - Ongoing) - This task is a placeholder for the costs associated with the DTSC oversight, which are billed to the owner on a quarterly basis. We assume the costs for oversight will be $40,000 per year for 3 years.

**Probable Cost Estimates**

The probable cost estimates for the above-described activities are presented in the attached tables, which were prepared in general accordance with United States Environmental Protection Agency (USEPA) guidance on cost estimating during the feasibility process. The estimated costs are prepared based on the information provided to-date for the Site, the media and contaminants identified, existing regulatory requirements, and our experience with similar projects, and were calculated in 2017 dollars (i.e., they do not account for inflation or the present value of future expenditures).

Based on the above scope of work, assumptions, and unit rates from similar projects in Southern California, we calculate a budgetary probable cost of approximately **$1,160,000** for the completion of all required activities to achieve a No Further Action for Soil. The attached tables show the detail of each task's cost calculation. As explained, a full Site closure is not expected, as the USEPA will continue to remediate and monitor groundwater

for decades, however, a Soil Only No Further Action Determination is achievable and will provide sufficient regulatory release to allow full market value to be achieved.

## Discussion of Uncertainty

Consistent with standard industry practice, assumptions were used to address uncertainties related to the actual implementation of remedial work. Additionally, the total estimated costs of the selected remedies are primarily dependent on how precisely the project is defined. Therefore, changes in project definition, such as limitations on access, availability of materials, or changes to regulations, for example, will result in a change in the project cost. For this study, the remedial actions selected for the project are conceptual, and cost estimates are not based on detailed engineering designs.

## Closing

The undersigned hereby certifies that they are an expert in the subject matter presented herein, wholly qualified to evaluate the subject matter, and provide a professional opinion as to the likely future cost of the work as described. The understanding of the current Site conditions and estimates presented are based on the materials available as presented and could be affected by new findings or unknown conditions.

Please do not hesitate to contact me with any questions.

Thank you,

Sincerely,
MUREX ENVIRONMENTAL, INC.

Jeremy R Squire, PE
Vice President

Attachments:  Cost Estimate Part I - Calculation of Probable Cost - VOC Cleanup
Cost Estimate Part II - Calculation of Probable Cost - Site-Wide Activities & Closure Work

| ENGINEERING OPINION OF PROBABLE REMEDIATION COST | | | | 1057-001-401 |
|---|---|---|---|---|
| Part I (VOC Cleanup) - SVE Pilot Test & Full Scale SVE Installation/Operation | | Former Crown City Plating Facility - El Monte, CA | | 19-May-17 |

| NO. | ITEM | QUANTITY | UNIT (EA, LF, LS) | UNIT RATE | TOTAL |
|---|---|---|---|---|---|
| **1.00** | **Pilot Testing, Pilot Test Report** | | | | |
| 1.01 | Plan, Prep, Utility Clearance, PM, Meetings | 1 | Est | $8,000. | $8,000 |
| 1.02 | Permits | 0 | EA | $519. | $0 |
| 1.03 | Well Drilling - SVE & Vapor Wells, Sampling & Analysis | 240 | FT | $100. | $24,000 |
| 1.04 | Temporary Electrical (Install, Equip Rental, Usage) | 1 | WEEK | $2,500. | $2,500 |
| 1.05 | Temporary System Rental, Mob/Demob, Carbon, Hoses, etc | 1 | WEEK | $8,500. | $8,500 |
| 1.06 | Waste Disposal (non-haz) | 18 | Drum | $150. | $2,700 |
| 1.07 | Field Labor, Lab Analysis, Equipment, Travel, PPE | 1 | Est | $35,000. | $35,000 |
| 1.08 | Data Evaluation, Report, DTSC Review & Responses | 1 | Est | $9,000. | $9,000 |
| | Pilot Testing, Pilot Test Report Approximate Subtotal: | | | | $90,000 |
| **2.00** | **Design Data Collection/Address Data Gaps (excludes Cr(VI) Analysis)** | | | | |
| 2.01 | Workplan | 1 | LS | $5,000. | $5,000 |
| 2.02 | Permits | 0 | EA | $519. | $0 |
| 2.03 | Borings by Direct Push to appx 50 ft | 250 | FT | $35. | $8,750 |
| 2.04 | Borings by Hollow-Stem Auger to 100 ft | 400 | FT | $50. | $20,000 |
| 2.05 | Sample Analysis | 130 | EA | $100. | $13,000 |
| 2.06 | Field Geologist (10-Hr Field Sci + truck, fuel, PID, PPE) | 4 | DAY | $1,300. | $5,200 |
| 2.07 | Final Boring Log Review & Plot, Prepare Cross-Sections | 64 | HR | $100. | $6,400 |
| | Design Data Collection/Address Data Gaps (excludes Cr(VI) Analysis) Subtotal: | | | | $58,350 |
| **3.00** | **Design & Remedial Action Workplan** | | | | |
| 3.01 | Design | 1 | LS | $6,500. | $6,500 |
| 3.02 | Remedial Action Workplan (VOCs Only) | 1 | LS | $12,000. | $12,000 |
| 3.03 | Public Participation Plan (Excluded, refer to Full Site Remedy) | 0 | LS | $8,000. | $0 |
| | Design & Remedial Action Workplan Subtotal: | | | | $18,500 |
| **4.00** | **Permitting, Procurement, Well Installation, Construction** | | | | |
| 4.01 | Plan Check, Permitting through City of El Monte | 1 | Est | $1,500. | $1,500 |
| 4.02 | AQMD Permit Fee, Application, Corresp | 1 | Est | $8,000. | $8,000 |
| 4.03 | Electrical Installation, 240VAC x 100 Amps | 1 | EA | $6,500. | $6,500 |
| 4.04 | SVE Well Installation - 12 Wells, dual nested | 1020 | FT | $55. | $56,100 |
| 4.05 | System 1 - 600 cfm @ 14 in-Hg (Purchase) | 1 | LS | $28,000. | $28,000 |
| 4.06 | VGAC Vessels (2x4,000#) | 2 | EA | $3,500. | $7,000 |
| 4.07 | Drum Storage of Condensate | 20 | Drums | $60. | $1,200 |
| 4.08 | Initial VGAC Fill | 8000 | EA | $1.25 | $10,000 |
| 4.09 | Above-Ground Piping, Hoses, Manifold, Mob, Install | 1 | Est | $40,000. | $40,000 |
| 4.10 | Waste Disposal (non-haz) | 2 | Bin | $1,800. | $3,600 |
| | Permitting, Procurement, Well Installation, Construction Subtotal: | | | | $161,900 |
| **5.00** | **Debugging, Operation, Maintenance & Electrical Usage** | | | | |
| 5.01 | Debugging, Testing, Startup | 2 | Day | $2,400. | $4,800 |
| 5.02 | Electrical Usage - System 1 | 18 | MO | $1,100. | $19,800 |
| 5.03 | Electrical Usage - System 2 | 0 | MO | $800. | $0 |
| 5.04 | Maintenance (per system per month) | 18 | Sys/Mo | $350. | $6,300 |

Page 1 of 2

| | | | | | |
|---|---|---|---|---|---|
| 5.05 | AQMD Testing, per system, per month | 18 | Sys/Mo | $1,000. | $18,000 |
| 5.06 | Weekly Field Visits (incl. PPE, PID) | 78 | WEEK | $600. | $46,800 |
| 5.07 | Condensate Disposal | 24 | Drum | $105. | $2,520 |
| 5.08 | Replacement parts, maintenance | 12 | MO | $500. | $6,000 |
| 5.09 | Activated Carbon Changeout Service | 8000 | LB | $3. | $24,000 |
| 5.10 | PM, Oversight, DTSC Corresp, Client Corresp | 24 | Mo | $1,500. | $36,000 |
| | *Debugging, Operation, Maintenance & Electrical Usage Subtotal: $184,220* | | | | |
| 6.00 | *Rebound Testing, Verification Soil/Soil Vapor Sampling, Soil Closure Report* | | | | |
| 6.01 | Rebound Testing | 1 | Est | $18,000. | $18,000 |
| 6.02 | Verification Soil & Soil Vapor Sampling | 1 | Est | $45,000. | $45,000 |
| 6.03 | SVE Completion Report | 1 | Est | $8,500. | $8,500 |
| 6.04 | Demob, Carbon Disposal | 1 | LS | $9,000. | $9,000 |
| 6.05 | Reuse or Sale Value of System & Vessels | 1 | Credit | -$15,000. | ($15,000) |
| | *Rebound Testing, Verification Soil/Soil Vapor Sampling, Soil Closure Report Subtotal: $65,500* | | | | |
| | | | | SUBTOTAL: | $658,470 |

| ENGINEERING OPINION OF PROBABLE REMEDIATION COST | | | | 1057-001-401 |
|---|---|---|---|---|
| Part II - Site-Wide Activities & Closure Work | | Former Crown City Plating Facility - El Monte, CA | | 19-May-17 |

| NO. | ITEM | QUANTITY | UNIT (EA, LF, LS) | UNIT RATE | TOTAL |
|---|---|---|---|---|---|
| **1.00** | **Waste Disposal, Decon, FTU Closure** | | | | |
| 1.01 | Lab Pack & Dispose of Haz Waste | 1 | Est | $20,000. | $20,000 |
| 1.02 | Decontamination of FTU & Collection/Disposal of Rinsate | 1 | Est | $15,000. | $15,000 |
| 1.03 | Permit & Close Sample Box, Clarifier & Sumps | 3 | EA | $5,000. | $15,000 |
| 1.04 | Core & Test Concrete | 10 | EA | $450. | $4,500 |
| 1.05 | FTU Closure Report | 1 | Est | $5,000. | $5,000 |
| | *Waste Disposal, Decon, FTU Closure Approximate Subtotal:* | | | | *$60,000* |
| **2.00** | **Additional Characterization of Plating Lines & FTU** | | | | |
| 2.01 | Workplan | 1 | LS | $8,500. | $8,500 |
| 2.02 | Core & Borings by Direct Push to Avg Depth 30 ft | 45 | EA | $750. | $33,750 |
| 2.03 | Sample Analysis - 5 & 10 ft | 90 | EA | $280. | $25,200 |
| 2.04 | Sample Analysis - Deeper Samples | 180 | EA | $155. | $27,900 |
| 2.05 | Field Geologist (10-Hr Field Sci + truck, fuel, PID, PPE) | 6 | DAY | $1,300. | $7,800 |
| 2.06 | Final Report | 1 | Est | $18,000. | $18,000 |
| 2.07 | Waste Disposal | 10 | Drum | $105. | $1,050 |
| | *Additional Characterization of Plating Lines & FTU Subtotal:* | | | | *$122,200* |
| **3.00** | **Metals Remediation (Contingency)** | | | | |
| 3.01 | Workplan, HASP, Soil Management Plan | 1 | Est | $17,500. | $17,500 |
| 3.02 | City Permits | 1 | Est | $3,000. | $3,000 |
| 3.03 | Saw-cut & Break Concrete | 1800 | SQ FT | $5. | $9,000 |
| 3.04 | Excavation | 1000 | YD | $22. | $22,000 |
| 3.05 | Bin Delivery, Rental, Pickup | 40 | EA | $525. | $21,000 |
| 3.06 | Disposal of non-RCRA Hazardous Soil | 1500 | Ton | $80. | $120,000 |
| 3.07 | Confirmation Soil Sampling | 40 | EA | $280. | $11,200 |
| 3.08 | Field Engineer (10-Hr Field Eng + truck, fuel, PID, PPE) | 10 | DAY | $1,300. | $13,000 |
| 3.09 | Completion Report | 1 | Est | $20,000. | $20,000 |
| | *Metals Remediation (Contingency) Subtotal:* | | | | *$236,700* |
| **4.00** | **Closure Activities** | | | | |
| 4.01 | Health Risk Assessment | 2 | Day | $2,400. | $4,800 |
| 4.02 | Deed Restriction | 1 | LS | $1,500. | $1,500 |
| 4.03 | Long-Term O&M Plan | 1 | Est | $2,500. | $2,500 |
| 4.04 | Soil Closure Report | 1 | Est | $25,000. | $25,000 |
| | *Closure Activities Subtotal:* | | | | *$33,800* |
| **5.00** | **Regulatory & Project Management** | | | | |
| 5.01 | DTSC Oversight Fees | 3 | Year | $40,000. | $120,000 |
| 5.02 | Project Management | 36 | Mo | $800. | $28,800 |
| | *Regulatory & Project Management Subtotal:* | | | | *$148,800* |
| | | | | **SUBTOTAL:** | **$601,500** |

**Total for Part I & Part II Combined**     $1,159,970



# CITY OF EL MONTE
## ECONOMIC DEVELOPMENT DEPARTMENT

Minh Thai
Economic Development
Director
James M. Guerra
Chief Building Official

August 17, 2017

Carolyn A. Dye
As Bankruptcy Trustee
Law Office of Carolyn A. Dye
3435 Wilshire Blvd.
Suite 990
Los Angeles, CA 90010

- AND -

Mr. Jay Hooper, CEO
Temple CB, LLC
4048 Temple City Boulevard #101
El Monte, CA 91731

- AND -

ALL OTHER INTERESTED PERSONS

### SUBJECT: CITY OF EL MONTE NOTICE OF UNSAFE BUILDING

**4350 Temple City Boulevard
El Monte, CA 91731**

### (BUILDING RED TAG NOTICE)

**TO ALL INTERESTED PERSONS, PLEASE TAKE NOTICE:**

This City of El Monte Notice of Unsafe Building (the "City Notice") is sometimes referred to as a "Red Tag Notice." (See:  City of El Monte Municipal Code Chapter 15.01.010A; City of El Monte Building Code Sections 102.3 and 102.6.3)

**PLEASE TAKE NOTICE** that this City Notice applies to the property located at 4350 Temple City Boulevard, El Monte, California (the "Property") and to each of the structures (the "Buildings") located on the Property.  This City Notice also applies to the owner of the Property, all tenants and licenses and invitees of the owner and to all persons who may be present on the Property and to all other persons who may seek to enter the Property.

This City Notice is issued based upon life safety inspections of the Property conducted by officials with the Los Angeles County Fire Department in recent days, as well as recent independent observations by staff of the City of El Monte Building Department and Code Enforcement Department.

**IN ACCORDANCE WITH SECTION 102.1 OF THE CITY OF EL MONTE BUILDING CODE, THE BUILDINGS ON THE PROPERTY, AND EACH OF THEM, ARE HEREBY DECLARED TO BE UNSAFE BUILDINGS.**

**PLEASE TAKE FURTHER NOTICE** that the unpermitted use of any Building on the Property for the storage or processing of any product or material, including without limitation used clothing or fabrics, furniture, medical equipment or medical supplies, is a fire hazard.

11333 VALLEY BOULEVARD, EL MONTE, CALIFORNIA 91731-3293
WEBSITE: www.el-el-monte.ca.us

Carolyn A. Dye
Jay Hooper
All Interested Persons
August 17, 2017
Page 2

Any person who enters any Building on the Property without the prior permission of the El Monte Police Department in violation of this City Notice following the posting of the applicable notices on the Property and the Buildings shall be subject to a criminal misdemeanor citation by the City of El Monte.

The owner of the Property and all persons in possession of any interest or claim therein, are hereby ordered by the City of El Monte to take the following actions to eliminate this hazard:

1.  Immediately vacate the Buildings and discontinue the storage of any product or material in the Buildings and all interior areas thereof; and

2.  Immediately remove all combustible products and materials stored inside any of the Buildings or elsewhere on any portion of the Property; and

3.  Within 48 hours of the date of this City Notice, establish and thereafter maintain a 24 hour around the clock fire watch for the entire Property including all Buildings and exterior locations. Fire watch personnel shall be an employee of a private patrol operator licensed pursuant to California Business and Professions Code Section 7580, et. seq., and the private patrol operator shall be a subject to the approval by both the City of El Monte Police Department and the Los Angeles County Fire Department. (See Contact information below); and

4.  All persons who seek to enter the Property from and after the time when a copy of this City Notice is posted on the Property and each of the Buildings must have prior City of El Monte Police Department approval to be on the Property for a specific purpose and for a specific period of time authorized by the El Monte Police Department as long as the Fire Watch is in effect.

This City Notice shall take effect upon the time of the posting of the notices on the Property and the Buildings as provided in City of El Monte Building Code Section 102.3 and 102.6.3.

Provided that the City of El Monte Police Department has first approve an entry onto the Property or into one or more Buildings of the Property, any of the following shall not be a violation of this City Notice:

*   for a private guard or private patrol employee to be on the Property during the course of his/her regular duties;

*   for any person designated by the Bankruptcy Trustee to be on the Property or inside any Building for the purpose of conducting inspections or performing work to comply with this City Notice;

*   for any person designated by the owner of the Property to be on the Property or inside any Building for the purpose of conducting inspections or performing work to comply with this City Notice;

*   for any person designated by the State Department of Toxic Substance Control or the L.A. County Fire Department or the City of El Monte to conduct inspections or perform work to comply with this City Notice or to perform remedial environmental investigation or environmental clean-up work.

For permission for entry to the Property or any Building therein during the time when this City Notice is in effect, interested persons shall contact:

El Monte Police Department
Attn: Watch Commander
(626) 580-2100

11333 VALLEY BOULEVARD, EL MONTE, CALIFORNIA 91731-3293
WEBSITE: www.ci.el-monte.ca.us

Carolyn A. Dye
Jay Hooper
All Interested Persons
August 17, 2017
Page 3


-- AND --

Los Angeles County Fire Department
Attn:  Fire Department Battalion 10 Office
(626) 527-6940

Any interested person may request a hearing to review or challenge the validity of any provision of this
City Notice and the orders and instructions set forth herein in accordance with City of El Monte Building
Code Section 102.4. Such a request for a hearing shall be submitted in writing to the Building Official
within 30 days of the date of this City Notice. The requested hearing will be held before the City Council
of the City of El Monte or a City Building Board of Appeals appointed by the City Council for such a
purpose.

The City of El Monte hereby reserves the right to supplement, modify or terminate this City Notice upon
the posting of the Property with notice of such supplement, modification or termination.

If any interested person has any question regarding this City Notice, please contact the undersigned at
(626) 580-2050 or by email at jguerra@elmonteca.gov

Very truly yours,

CITY OF EL MONTE

James M. Guerra
Chief Building Official
City of El Monte

cc:     David Reynoso, Chief of Police, City of El Monte
        David Thies, Assistant Fire Chief, Los Angeles County Fire Department
        Minh Thai, Economic Development Director, City of El Monte
        Jess Villamayor, State of California Department of Toxic Substance Control
        Jesus M. Gomez, City Manager, City of El Monte

# REVISED VAPOR INTRUSION INVESTIGATION WORK PLAN

Temple CB, LLC
4350 Temple City Boulevard
El Monte, California 91731

*Prepared for:*

Temple CB, LLC
4350 Temple City Boulevard
El Monte, California 91731

*Prepared by:*

LAND C Corp.
2275 Huntington Dr., #315, San Marino, CA 91108
(626) 203-1879

June 23, 2016

Project No. 202E-16

# REVISED VAPOR INTRUSION INVESTIGATION WORK PLAN

Temple CB, LLC
4350 Temple City Boulevard
El Monte, California 91731

June 23, 2016

Project No. 202E-16

This work plan was prepared by the staff of LAND C. Corp
under supervision of the California Professional Geologist whose seal
and signature appear here on.

Jack Liu
Senior Geologist
Project Manager

Shaofu Chen
Professional Geologist PG No. 8536
Supervisor

Revised Vapor Intrusion Investigation Work Plan                                    LAND C Corp.

## Table of Contents

1.   INTRODUCTION...............................................................................................................1

2.   SITE HISTORICAL OPERATION ..................................................................................1

3.   HISTORICAL INVESTIGATIONS AND REMEDIAL ACTIONS.............................2

4.   OBJECTIVES, SCOPE, AND RATIONALE ...................................................................5

5.   SITE CONCEPTUAL MODEL FOR VAPOR INTRUSION .......................................6

  5.1    Potential VOC Sources ...............................................................................................6

  5.2    Potential Vapor Transport Mechanisms .................................................................7

  5.3    Potential Receptor .......................................................................................................8

6.   PROPOSED INVESTIGATION ACTIVITIES ..............................................................8

  6.1    Soil Gas Quality Assessment .....................................................................................9

  6.2    Sub-slab Probe Installation ......................................................................................10

  6.3    Sub-slab Probe Sampling ..........................................................................................11

  6.4    Indoor Air Sampling .................................................................................................12

  6.5    Outdoor Air Sampling ..............................................................................................12

  6.6    Analytical Method......................................................................................................13

  6.7    Quality Assurance/Quality Control ........................................................................13

7.   DATA EVALUATION AND RISK ASSESSMENT........................................................13

  7.1    Data Evaluation..........................................................................................................13

  7.2    Risk Assessment and Response Action ...................................................................14

8.   REPORTING ....................................................................................................................15

9.   SCHEDULE ......................................................................................................................15

10.   LIMITATIONS .................................................................................................................15

11.   REFERENCES..................................................................................................................17

**Revised Vapor Intrusion Investigation Work Plan**                                    LAND C Corp.

## FIGURES

Figure 1  Site Location Map
Figure 2  Facility Plot Plan Showing Proposed Sampling Locations
Figure 3 PCE Soil Gas Concentration Contours at 5 feet Depth, May 2004
Figure 4 PCE Soil Gas Concentration Contours at 5 feet Depth, March 2010
Figure 5 TCE Soil Gas Concentration Contours at 5 feet Depth, May 2004
Figure 6 TCE Soil Gas Concentration Contours at 5 feet Depth, March 2010
Figure 7 Area of PCE and TCE Impacted Soil Gas from Depth of 15 to 80 Feet
Figure 8 Sub-Slab Vapor Probe Typical Diagram
Figure 9 Sub-slab Soil Gas Sample Train Diagram

## APPENDICES

Appendix A Standard Operating Procedure for Sub-Slab Soil Vapor Sampling
Appendix B Standard Operating Procedure for Indoor Air Sampling
Appendix C Standard Operating Procedure for Ambient Air Sampling
Appendix D Building Survey Form
Appendix E Historic Investigation Data

Revised Vapor Intrusion Investigation Work Plan                    LAND C Corp.

## 1.   INTRODUCTION

On behalf of Temple CB, LLC, Land C Corp, Inc. (LAND) has prepared this vapor
intrusion investigation work plan to evaluate potential vapor intrusion for the existing
buildings impacted by certain volatile organic compounds (VOCs) at the facility of
Temple CB, LLC, which is located at 4350 Temple City Boulevard, El Monte, California
(the Site; Figure 1). The site is located in an industrial area in the western portion of the
City of El Monte. It is located north of the Union Pacific railroad tracks, and east of
Temple City Boulevard.

This work plan describes an approach to the vapor intrusion investigation. The purpose of
the investigation is to characterize volatile organic compound (VOC) concentrations of
indoor air in the existing buildings where elevated concentrations of Tetrachloroethene
(PCE) and trichloroethylene (TCE) have been identified in subsurface soils underneath
the existing buildings and to evaluate the risk level of people exposure to those toxic
substances.

## 2.   SITE HISTORICAL OPERATION

Historically, the site was owned by Crown City Plating Company (CCPC) before 2008.
CCPC operated a metals plating facility at the site from 1956 to 2004. Site operations
included large scale, mass production electroless plating, electroplating, burnishing, and
painting of automotive, hardware, and decorative parts (AMEC, 2010a). Plastic injection
molding also was performed at the site. During its operations, CCPC reportedly was one
of the largest metal finishers in the United States specializing in brass, chrome, copper,
and nickel plating, as well as plastics plating and finishing for the automotive, electronics,
plumbing, and hardware industries. Some gold and silver plating also took place at the
site (AMEC, 2010a). In late 2004, CCPC ceased site operations and subsequently sought
bankruptcy protection. Between 2004 and 2007, CCPC conducted site closure activities,
including the disposal or removal of plating solutions and equipment. However, funding
for closure activities was depleted before all hazardous substances and wastes were
removed and cleanup was completed. CCPC subsequently abandoned the site. As a result
of bankruptcy proceedings, fee title to the property was transferred to Continental
Business Credit, Inc. in June/July 2008. The site remains unoccupied. Continental
Business Credit, Inc. constructed perimeter fencing and secured building access points to
restrict unauthorized entry. They also provide a security guard to restrict entry to the site.
The site was purchased by Temple CB, LLC in November 2012. Presently the site is
owned by Temple CB, LLC and remains unoccupied, which is surrounded by chain
fences.

1

Revised Vapor Intrusion Investigation Work Plan                              LAND C Corp.

## 3.    HISTORICAL INVESTIGATIONS AND REMEDIAL ACTIONS

Several investigations and remedial actions were conducted at the site. Remedial activities and significant results of investigations are summarized below.

### UST Investigations

In November, 1986, EMCON Associates conducted a Leak Detection Program and a Tank Monitoring Program for fifteen tanks and five sumps. The contents of the tanks were diesel fuel, gasoline, nitric acid and absorption oil, while the sumps contained sanitary sewage and process waste. Tank Integrity Testing was performed on all tanks by trained technicians. The tank integrity testing revealed that piping of some tanks failed. These failed pipes were uncovered and repaired after the tank integrity testing. All other tanks were in compliance (AMEC, 2010a).

In March 1995, Aerovironment, Inc. oversaw the removal of four underground storage tanks at Crown City Plating Company. Two of these tanks contained gasoline, one diesel and the last contained waste oil. Confirmatory soil samples collected from beneath dispensers were analyzed for compounds related to tank contents. TPH-g was detected in the soil samples at concentrations up to 14,000,000 micrograms per kilogram (µg/kg). PCE and TCE, among other VOCs, were detected in the soil samples at concentrations up to 17 and 39 µg/kg, respectively. Where high concentrations of volatile organic compounds (VOC) were found the soil was excavated and removed till the concentrations reduced to the levels acceptable to the Los Angeles County Department of Public Works and Fire Department (AMEC, 2010a).

In December 1999, American Integrated Services retained by CCPC conducted the closure activities of eleven USTs at CCPC. Two of these tanks were removed and the others were abandoned in place. The 40-foot borings in the vicinity of these tanks were sampled to determine whether contaminations of the tanks contents were present. VOC contaminations in majority of the samples collected were determined as non-detectable. Some samples showed near detection limit concentrations of VOCs. It was stated that "no significant impact" has been measured in the subsurface soil at the abandoned in-place USTs as well as the removed USTs (AMEC, 2010a).

### Soil Gas Investigations

Between 1993 and 1994, soil gas surveys were conducted by Inland Empire Environmental Services. Soil gas samples were collected from 24 probes installed at depths between 5 and 15 feet and analyzed for VOCs using a portable gas chromatograph. Elevated concentrations of VOCs were detected in samples collected from areas around the former drum storage area (southern parcel), the southeast portion of the central parcel, the storm drain located between the warehouse and maintenance buildings, and the chemical storage shed outside paint department (eastern parcel). However, notes from Regional Water Quality Control Board (RWQCB) staff indicate they did not oversee the investigation due to the consultant's consistent equipment problems. Thus, these results were considered suitable for "screening level" purposes only (AMEC, 2010a).

2

Revised Vapor Intrusion Investigation Work Plan                              LAND C Corp.

In 1995, Environmental Support Technologies carried out multi-depth soil gas surveys. Soil gas probes were installed at depths between 10 and 40 feet in areas identified during the 1993/1994 soil gas investigation. Elevated concentrations of PCE, TCE, and TCA up to 81, 24, and 344 micrograms per liter (µg/L), respectively, were detected in samples collected from probes installed in the former drum storage area and the storm drain located between the warehouse and maintenance buildings. PCE and TCE were detected in soil gas samples from the southeast portion of the central parcel at concentrations up to 3 and 12 µg/L, respectively.

In 2004, Glenfos, Inc. conducted another soil gas survey for the site. Soil gas sampling was conducted from probes installed at the depth of 5 feet at 91 locations spread throughout the site. PCE and TCE were detected in samples collected from probes installed in the molding department and warehouse, former drum storage area, and southeast portion of the central parcel at concentrations up to 1,241 and 2,630 µg/L, respectively. Subsequently, four permanent nested soil gas wells were installed in the molding department (VW-1), former drum storage area (VW-2), southeast portion of the central parcel (VW-3), and in the eastern parcel (VW-4). At each location, nested soil gas probes were installed at the depths of 20, 40, 60, and 80 feet. PCE and TCE were detected in samples collected from probes at VW-1 and VW-3 at concentrations up to 697 µg/L (VW-3 at 20 feet) and 2,114 µg/L (VW-3 at 40 feet), respectively. PCE and TCE were detected in 80-foot depths samples at concentrations up to 239 µg/L (VW-1) and 1,290 µg/L (VW-3), respectively.

In 2010, AMEC Environment & Infrastructure (AMEC) performed a Supplemental Site Investigation (SSI). Soil gas sampling was conducted from probes installed at depths between 5 and 15 feet at 44 locations in the central and eastern parcel. Elevated VOCs (primarily PCE and TCE) were detected in probes installed in the molding department and southeast portion of the central parcel at concentrations up to 260 and 720 µg/L, respectively. During the 2010 AMEC SSI, soil gas samples were collected from permanent nested soil gas probes VW-1, VW-3, and VW-4. Elevated VOCs (primarily PCE and TCE) were detected in VW-1 and VW-3 at concentrations up to 970 µg/L and 3,000 µg/L, respectively.

**Subsurface Soil Sampling**
Between 1987 and 1989, several soil borings were installed in the former drum storage area in the southern parcel; and soil samples were collected to depths of 20 feet. VOCs (primarily PCE and TCA) were detected in several soil samples at concentrations up to 320 and 2,890 µg/kg, respectively. Three groundwater monitoring wells were installed to depths of approximately 100 feet during 1988/1989 investigations. Two wells (E-1 and E-2) were installed in the southern parcel and one well (E-3) was installed in the eastern parcel. Soil samples were collected at various depths during drilling for well installation. TCE was detected in two soil samples at concentrations up to 11 µg/kg (E-2 at 40 feet and E-3 at 80 feet) and TCA was detected in one soil sample at a concentration of 43 µg/kg (E-1 at 40 feet).

3

As stated earlier, in 2004 four permanent nested soil gas wells were installed by Glenfos in the molding department (VW-1), former drum storage area (VW-2), southeast portion of the central parcel (VW-3), and in the eastern parcel (VW-4). Soil samples were collected at various depths during drilling for installation of the nested soil gas wells. PCE and TCE were detected in several samples collected from VW-1 (including samples from depths of 70 and 75 feet) at concentrations up to 440 and 2,100 μg/kg, respectively. PCE and TCE were detected in several samples collected from VW-3 (including samples from depths of 70 feet) at concentrations up to 140 and 630 μg/kg, respectively.

In 2006, soil samples were collected by Clayton Group Services, Inc. (Clayton) from 42 borings at 16 areas of concern (AOC). Soil samples were analyzed for VOCs, semi-volatile organic compounds (SVOCs), TPH, metals, and hexavalent chromium. Generally, the deepest sample of each boring was analyzed for metals. Two background soil samples were collected and analyzed for metals. The soil samples did not contain reported concentrations of VOCs, SVOCs, or TPH. Hexavalent chromium was detected in several soil samples at concentrations up to 55.6 milligrams per kilogram (mg/kg).

In 2010, 87 soil samples were collected by AMEC from 64 locations at the 16 AOCs in the central and eastern parcels. Sampling depths ranged from 0.5 feet to 20 feet. Concentrations of arsenic, chromium, hexavalent chromium, copper, lead, and nickel exceeding either respective screening levels or estimated background levels were detected in soil samples collected from locations in AOCs 1, 5, 6, 7, and 13 (AMEC, 2012).

In 2012, during the Data Gap Investigation, AMEC collected 153 soil samples using direct push drilling and hand auger methods. Of these, 116 soil samples (including 11 duplicate samples) were analyzed for metals, including hexavalent chromium. Elevated concentrations of hexavalent chromium, arsenic, lead, and nickel were detected in some soil samples.

**Groundwater Investigation**
As mentioned above, groundwater monitoring wells E-1 and E-2 were installed in the southern parcel and well E-3 was installed in the eastern parcel during 1988/1989 investigations. Between 1989 and 1998, PCE and TCE were detected in groundwater samples from E-1 and E-2 at concentrations up to 600 and 3,600 μg/L, respectively. Reported concentrations of chromium and nitrate in E-2 also exceeded their respective drinking water Maximum Contaminant Levels (MCLs). PCE and TCE were detected in groundwater samples from E-3 at concentrations up to 34 and 730 μg/L, respectively. Monitoring wells E-1 and E-3 were dry during the 2010 AMEC SSI.

In 2010, water that had entered the building through leaks in the roof and accumulated in AOCs 5, 6, 9, and 16 was sampled and analyzed for metals and hexavalent chromium by AMEC. Elevated hexavalent chromium concentrations were detected in samples collected from AOCs 5 and 16 (AMEC 2012b).

The site is located within the El Monte Operable Unit (EMOU) of the San Gabriel Valley Area 1 Superfund Site. In May 1990, the U.S. EPA issued a Notice of Potential Liability for the San Gabriel Valley Superfund Site to CCPC. This work plan does not address potential groundwater impacts associated with CCPC operations or potential regulatory requirements associated with the U.S. EPA's Notice of Potential Liability for the San Gabriel Valley Superfund Site issued to CCPC.

**Particle/Sediment Sampling**
In 2010 sediments accumulated on the roof of the northern building (roof sample) and in a sump (sump sample) at the southeast corner of the Courtyard were sampled by AMEC. Both samples were analyzed for hexavalent chromium. The roof sample was also analyzed for other metals. Hexavalent chromium was detected in the sump sample at a concentration exceeding screening levels. Elevated concentrations of chromium, copper, lead, nickel, and zinc were detected in the roof sample (AMEC 2012b).

**Building Material Sampling**
In 2010, concrete and brick samples were collected by AMEC from locations in AOCs 1 and 5. Wipe samples were collected from AOCs 1, 5, and 13. All samples were analyzed for metals and hexavalent chromium. All brick and concrete samples were reported to contain elevated concentrations of chromium, hexavalent chromium, copper, lead, and nickel. Elevated concentrations of hexavalent chromium, copper, nickel and cyanide were detected in several wipe samples (AMEC 2012b).

In addition to physical samples, x-ray fluorescence (XRF) methods were used to assess metallic composition in building surfaces during the 2010 SSI. A total of 101 XRF readings were taken from various locations in the plating line pits/sumps from AOCs 1, 5 and 13. Elevated concentrations of chromium, copper, lead, nickel, and zinc were detected in most XRF locations (AMEC 2012b).

Copies of relevant historical analytical data summary tables and figures for VOCs from above mentioned documents are provided in **Appendix E**.

## 4.   OBJECTIVES, SCOPE, AND RATIONALE
The results of historical investigations indicate that TCE and PCE contamination and their vapor intrusion may be main issues at the subject site. The objective of the soil vapor intrusion evaluation to be conducted by LAND is to define the potential impact of on-Site vapor intrusion to future site activities so that a response scenario, if necessary, can be developed to protect human health and the environment. The contour maps of TCE and PCE soil vapor concentrations in Figure 3 through Figure 6 indicate that the elevated vapor concentrations are located underneath those buildings historically used for warehouse, molding department, and shipping and receiving. The specific objectives of the work presented in this Work Plan are:
   a.  Evaluate the potential vapor intrusion of VOCs including TCE and PCE at the warehouse, molding department, and shipping and receiving buildings, and
   b.  Determine the impact or potential impact of the vapor intrusion to human health.

5

## 5.    SITE CONCEPTUAL MODEL FOR VAPOR INTRUSION

The Site Conceptual Model (SCM) for vapor intrusion has been refined in consideration of latest obtained data that indicate the presence of significant on-site sources of TCE and PCE as well as other technical information regarding geology and hydrogeology, spatial distribution of contaminant concentrations, area buildings and potential vapor transport mechanisms. This vapor intrusion SCM summarizes current understanding of Site characteristics and will be further refined and updated as additional characterization data are obtained as outlined in this Work Plan. Technical information used to refine this SCM is described earlier in this document or in other reports, and is summarized below.

### 5.1 Potential VOC Sources

CCPC ever had fifteen UST tanks, storage drums, and associated pipes on the site, which were generally considered as primary VOC sources.

In March 1995, four USTs were removed and elevated VOC concentrations were detected in soil samples. Soil excavation and removal was conducted at the location that high concentrations of VOC were found till the concentrations reduced to the levels acceptable to the Los Angeles County Department of Public Works and Fire Department (AMEC 2010a). In December 1999, the remaining eleven USTs were closed. Nine of them were abandoned in place; and two of them were removed. Soil samples in the vicinity of these tanks were collected to determine whether contaminations of the tanks contents were present. The analytical results indicated that "no significant impact" had been detected in the subsurface soil at the abandoned in-place USTs as well as the removed USTs (AMEC 2010a). Between 2004 and 2007, CCPC conducted site closure activities, including the disposal or removal of plating solutions, equipment, and storage drums, etc.

However, historical investigation results indicated that elevated VOC concentrations were detected at several other locations. As described in Section 3, PCE and TCE were detected in soil samples at concentrations up to 440 and 2,890 µg/kg, respectively. The maximum concentrations of PCE and TCE detected in groundwater were 600 and 3,600 µg/L, respectively. The results of historical soil gas investigation in Figure 3 through Figure 6 indicate that elevated concentrations of PCE and TCE are located at the previous Warehouse, Molding Department, and Shipping and Receiving room. Contaminated soils and groundwater beneath the site become potential secondary VOC source. These secondary sources may be generated by multiple unauthorized releases occurred on the site when CCPC was in operation. These unauthorized releases may include onsite storage drums leaking, piping leaking, and accidently solvent spilling, etc.. But no record about these releases was found during the preparation of this work plan.

6

## 5.2 Potential Vapor Transport Mechanisms

As mentioned above, historical multiple unauthorized VOC releases may have occurred on the site. Part of VOC should vaporize into ambient air. The remaining portion would migrate into soils below the release points via surface cracks or soil pores under gravity, further to migrate into groundwater. Although potential primary VOC sources have been eliminated, impacted soils and groundwater remain beneath the site. Vapor intrusion (VI) can be conceptualized as shown Figure 1-1.



Figure 1-1 Vapor Intrusion –Conceptual Model (DTSC,2012)

VOCs volatilize from impacted soil and/or groundwater beneath a building and diffuse toward regions of lower chemical concentration (e.g., the atmosphere, conduits, basements). Soil gas can flow into a building due to a number of factors, including barometric pressure changes, wind load, thermal currents, or depressurization from building exhaust fans. The rate of movement of the vapors into the building is a difficult value to quantify and depends on the characteristics of the subsurface VOC vapor source (strength and location), vadose zone geology (soil type, stratum continuity), vadose zone hydrology (moisture content, depth to groundwater, capillary fringe thickness), vadose zone chemical and biological factors that determine the level of biodegradation, building (type and condition of slab, operation of the HVAC), and climate, etc.

7

The transport of VOC vapors in the vadose zone is dominated by diffusion with advection only occurring in the immediate vicinity of buildings or when there is a pressure gradient. Diffusion occurs from areas of greater concentration to lower concentration. Vapor-phase diffusion in the subsurface varies with total porosity and moisture content. Soils beneath the site consist of alternating layers of silt, sand, silty sand, and gravelly sand, which provide a favorable condition for diffusion of VOC vapors.

Diffusion of VOC vapors from sources in shallow groundwater occurs as a result of a concentration gradient between the groundwater source and the surrounding area. Based on historical groundwater investigation and available data, the potential of VOC vapor intrusion from groundwater is low due to the groundwater depths at approximately 95 feet bgs on the Site. Therefore, potential secondary sources to be evaluated in this VI investigation will be limited to VOCs in soil and soil gas.

Upon entry into a structure, soil gas mixes with the existing air through the natural or mechanical ventilation of the building. The intruded VOC vapors will pose a human health risk via inhalation.

## 5.3 Potential Receptor

The potential to an unacceptable human health risk will depends on the in-door VOC concentrations and the duration of the critical exposure period, etc. Presently the buildings on the Site remains unoccupied, which is surrounded by chain fence and secured building access points to restrict unauthorized entry. However, the property owner intends to use those buildings as storage warehouse associated with administration offices in the future. The future warehouse workers and administrative personnel will be potential receptors via inhalation while performing day-to-day indoor activities. An unacceptable human health risk posed by VOC vapor intrusion may exist if the intruded VOC concentrations exceed their screen levels. This VI investigation will address the health risk of future workers and administrative personnel due to exposures to all detected VOCs.

This SCM will be refined as additional data are obtained and evaluated.

## 6.    PROPOSED INVESTIGATION ACTIVITIES

A series of sampling activities will be completed to characterize the on-Site conditions to delineate the extent of on-Site contaminant migration and the impact of soil vapor intrusion on the indoor air quality of the surrounding properties. The following subsections describe the field activities to be conducted during the vapor intrusion investigation. This vapor intrusion investigation will be performed in accordance with *Guidance for the Evaluation and Mitigation of Subsurface Vapor Intrusion to Indoor Air --Final*, October 2011, DTSC and *Advisory-Soil Gas Investigations*, July 2015, DTSC, LARWQCB & SFRWQCB. Based on the DTSC VI investigation guidance, multiple lines of evidence should be collected in the evaluation of vapor intrusion due to VOC contamination in the subsurface. The scope of work proposed in this work plan will

8

Revised Vapor Intrusion Investigation Work Plan                           LAND C Corp.

include sub-slab soil vapor, and indoor and outdoor ambient air sampling. Based on the findings, additional investigation activities and data analyses may be proposed to further define the impact to on-Site and off-Site receptors. Soil gas generated from vadose zone and/or groundwater will be characterized in future investigation if it is necessary and required.

The following scope of work was designed to meet the objectives set forth in Section 4.0. The scope of work consists of:
   survey of sampling locations; and
   installation of sub-slab soil vapor sampling implants;
   collection of sub-slab soil vapor and indoor and outdoor ambient air samples;
·  preparation of Vapor Intrusion Evaluation Report.

In order to help characterize the potential VI of VOCs, vapor sampling will be conducted in selected locations of Warehouse, Molding Department, and Shipping and Receiving buildings, which is shown in **Figure 2**.

## 6.1 Soil Gas Quality Assessment

Delineation of potential indoor sources within industrial facility is critical to evaluating the human health risk. Due to the complexity of vapor intrusion, multiple lines of evidence are needed to reasonably estimate the level of risk posed by the vapor intrusion. One indoor air sampling event is not representative of continuous long-term exposure within a building. At a minimum, sampling data will be obtained over two seasons to evaluate the seasonality of vapor migration into the buildings. The two sampling events are planned to be conducted in mid-July, 2016 and mid-January, 2017. A variety of different indoor air environments are involved; and it may be difficult to differentiate sub-slab and outdoor sources if VOCs are detected in the subsurface. In order to address this issue, it is recommended that sub-slab and indoor air sampling should be undertaken concurrently at selected buildings.

For the first sampling event, sub-slab, indoor, and outdoor air samples will be collected over a 24-hour period from 9:00 AM of the first day to 9:00 AM of the second day to ensure diurnal fluctuations in vapor intrusion and indoor air concentrations are included in the sampling period. After vapor intrusion is confirmed, the second sampling event will be conducted to produce representative concentrations of the monitored compounds over the anticipated 8-hour exposure period for building occupants (8:30 AM to 4:30 PM).

Prior to the start of sampling, the Building Survey Form (Appendix D) should be completed and indoor air should be screened by a portable PID. A floor diagram should be generated, illustrating the floor layout, garages, doorways, stairways, basement sumps, utility conduits, elevator shafts, and any other pertinent information.

The doors and windows of the buildings should be closed and any ventilation in the space should be turned off during the 24-hour period. Presently, the facility is not

9

allowed to be used. Therefore, regular work at the facility is not anticipated to take place during the first sampling event. However, if regular work at the facility takes place during the 24-hour period, an alternative sampling procedure will be implemented as follows: indoor air samples will be collected from after office hours (5:00 PM) to just before the start of the work day (8:00 AM) with the ventilation, door, and windows closed. The next set of indoor air samples will be collected from the start of the work day (8:00 AM) to the end of the work day (5:00 PM). Simultaneously, the sub-slab samples will be collected during the 24-hour period (5 PM of the first day to 5 PM of the second day).

The tasks involved in the assessment of potential vapor intrusion into building indoor air are described below. It is recommended that a minimum of two seasonal sampling events of sub-slab soil vapor, and indoor and outdoor ambient air sampling should be completed to properly evaluate soil vapor intrusion. Proposed sub-slab soil vapor, indoor air, and outdoor air sampling locations are shown in **Figure 2**. The following tasks represent the general approach that would be followed to complete the investigation.

### 6.2 Sub-slab Probe Installation

To investigate the potential for contaminants in the subsurface to volatilize from soil to soil gas within the unsaturated overburden at selected locations, the installation and sampling of semi-permanent sub-slab soil gas probes at selected locations is proposed. Before installing the sub-slab vapor probes, a building inventory will be conducted in accordance with the DTSC VI Guidance. The building inventory will be used to determine the final sample locations.

A total of ten semi-permanent sub-slab gas probes are proposed, as indicated on **Figure 2**. One sub-slab vapor sample will be collected from each of these proposed locations. Each sub-slab gas probe will consist of one shallow soil gas probe installed in a central location away from foundation footings, just below the surface of the slab. The sub-slab probe will be installed by drilling a 1.0 to 1.25 inches in diameter hole through the slab with either an electric hand drill or concrete corer. All sub-slab utilities, such as water, sewer, and electrical, should be located and clearly marked on the slab prior to drilling. Sub-slab holes will be advanced three to four inches into the engineering fill below the slab. All drill cuttings will be removed from the borehole. The sampling probe will be constructed with the following specifications:

- Vapor probes are constructed of 1/8 inch or 1/4 inch diameter tubing, with a permeable probe tip. A Teflon™ sealing disk will be placed, as needed, between the probe tip and the blank pipe to prevent the downward migration of wet bentonite into the sand pack.
- Dry granular bentonite will be used to fill the borehole annular space to above the base of the concrete foundation. Hydrated bentonite will then be placed above the dry granular bentonite. The bentonite for this portion of probe construction will be hydrated at the surface to ensure proper sealing. The remainder of the hole will be

10

**Bill Friedman**

| | |
|---|---|
| **From:** | "Rene Mexia" <rene@majorproperties.com> |
| **To:** | "Bill Friedman" <billfried@earthlink.net>; "Jeff Luster" <jeff@majorproperties.com> |
| **Sent:** | Monday, August 07, 2017 1:54 PM |
| **Attach:** | Revised Vapor Air Plan June 23 2016_Part1.pdf |
| **Subject:** | Fwd: Revised Vapor Air Plan dated June 23rd 2016 |

Bill, see below from the buyer that sent us that other letter earlier. he also just sent us this vapor report.


Regards,

**Rene Mexia**
**Major Properties | Commercial & Industrial Specialists**
DRE License# 01424387
**Serving Greater Los Angeles For Over 40 Years**
**1200 W. Olympic Blvd   Los Angeles, CA 90015**

o 213.747.4155  -  c 213.446.2286  -  f 213.749.7972
rene@majorproperties.com | www.majorproperties.com

PLEASE NOTE:  Major Properties does not provide legal, tax or accounting advice, and recommends that you obtain such advice before entering into a real estate transaction.

---------- Forwarded message ----------
From: **Hunter Simmons** <hunters@bridgeadvisorsllc.com>
Date: Mon, Aug 7, 2017 at 1:02 PM
Subject: Revised Vapor Air Plan dated June 23rd 2016
To: Rene Mexia <rene@majorproperties.com>
Cc: jimo@bridgeadvisorsllc.com


Rene --


I believe I found the approved work plan dated June 23rd, 2016 on the Envirostar link you provided me. I attached part 1.


Please confirm this is the approved work plan.


Thank you,


Hunter

8/7/2017



**Fulcrum Resources Environmental**
517 South Ivy Avenue, Monrovia, California 91016
Tel (800) 385 7105 Fax 800.385.7126

July 26, 2017

**Department of Toxic Substance Control**
**Brownfields and Environmental Restorations Programs**
**Chatsworth Office**
**9211 Oakdale Avenue**
**Chatsworth, California 91311**

**CC: Mr. Jay Hooper**

Subject:    **Status Update-Crown City Plating SVE Pilot Study**
            4350 Temple City Boulevard
            El Monte, California 91780

Fulcrum Resources Environmental (FR) is pleased to present this status update summary pertaining to the recent SVE Pilot Study and Testing in accordance with the pre-approved workplan.

SVE pilot testing was conducted between June 26 and June 29. Equipment was demobilized on Friday, June 30. Per the approved workplan, a round of post-pilot test rebound samples was collected on Friday, July 14. Another round needs to be collected this Friday, July 28.

Meanwhile, we're finished analyzing data and are writing up the report now. We have produced a cross-section and figures, and have also put together a conceptual layout of where the full-scale system wells should be installed. Based on our analysis, the upper, or "A" zone exhibited a radius-of-influence (ROI) of approximately 40 feet. The ROI in the lower, or "B" zone is approximately 70 feet.

Based on the findings, we believe an additional twelve (12) A zone wells and an additional three (3) B zone wells would be needed to address the VOC plume area with a full-scale system, which would all be located within the former molding department, the warehouse, and the parking area outside the warehouse.

By the time we have the data back from the lab for the 4-week post-pilot samples, we should have a draft to provide to you and the owner.

We appreciate the opportunity to work with you. If any questions, please do not hesitate to contact us.

Sincerely,

1



**Fulcrum Resources Environmental**
517 South Ivy Avenue, Monrovia, California 91016
Tel (800) 385 7105 Fax 800.385.7126



Don Kellar, MS, NREP, PG
Senior Geologist

**2**

# EXHIBIT "B"

# EXHIBIT "B"

## ASSIGNMENT AGREEMENT

This Assignment Agreement ("Agreement") is entered into as effective as of October 14, 2017, by and between TB Holdings LLC Pension Plan ("TB Holdings") and El Monte SS Properties, LLC ("El Monte SS"). TB Holdings and El Monte SS are sometimes referred to hereafter as a "Party" or collectively as the "Parties". This Agreement is entered into with respect to the following facts.

## RECITALS

A.    On or about September 12, 2017, TB Holdings and Carolyn A. Dye in her capacity as Chapter 7 Trustee (the "Trustee") for the estate of Temple CB, LLC, Case No: 2-17-bk-10301 (the "Chapter 7 Case") have executed a document entitled Counter-Offer (the "Contract").

B.    Pursuant to the Contract, TB Holdings as Buyer and the Trustee as Seller have entered into a contract for the sale by the Trustee to TB Holdings and/or Assigns of real property more commonly known as 4350 Temple City Blvd., El Monte, California (the "Property"), subject to Bankruptcy Court approval and overbids.

C.    TB Holdings has provided A&A Escrow Services, Inc. as Escrow Holder an initial deposit of $240,000.00 (the "Escrow Deposit"), which is refundable until the end of a due diligence period ending at close of business on October 18, 2017.

D.    TB Holdings and El Monte SS wish to enter into this Agreement assigning all of TB Holding's rights pursuant to the Contract to El Monte SS.

E.    The Contract provides that any assignment by TB Holdings of its rights under the Contract shall require the Trustee's written approval, which may be granted or withheld in the Trustee's sole and absolute discretion.

F.    Subject only to the written approval of the Trustee and the sending of wire transfer instructions for a wire transfer to the Escrow Holder, TB Holdings and El Monte SS wish to enter into this Agreement. If the Trustee fails to provide written approval of this Agreement and wire transfer instructions for El Monte SS to wire funds to the Escrow Holder on or before 10:00am (PST) on October 18, 2017, then this Agreement shall become null and void.

## NOW, THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:

1.    TB Holdings hereby assigns to El Monte SS all of its rights under the Contract or otherwise to purchase the Property.

2.    El Monte SS shall on or before October 18, 2017 send by wire transfer the amount of $240,000.00 (the "Replacement Deposit") to Escrow Holder, at which time the Replacement Deposit shall be deemed to be nonrefundable. Upon the funding of the Replacement Deposit, the Escrow Holder shall return by wire transfer to TB Holders the Escrow Deposit. The Parties and

1

the Trustee shall cooperate to provide escrow instructions to Escrow Holder to effectuate the return of the Escrow Deposit upon the funding of the Replacement Deposit.

3.    If El Monte SS acquires the Property for the price of not more than $8,000,000.00 pursuant to a motion for approval of the sale of the Property to be heard by the Bankruptcy Court (the "Sale Hearing"), then TB Holdings shall be paid $250,000.00 by El Monte SS within 30 days of the entry of the Order authorizing sale, provided that the Order of sale includes a finding that El Monte SS purchased the property in good faith and that 11 U.S.C. Section 363(m) applies to such sale. If the Order authorizing sale does not contain such findings, then TB Holdings shall be paid such amount upon the Order authorizing sale becoming final and non-appealable. If at the Sale Hearing there are overbids from the Contract price of $8,000,000.00, then even if El Monte SS acquires the Property then TB Holdings shall not be paid the $250,000.00 payment reference in this paragraph. If at the Sale Hearing the property is sold to a bidder other than El Monte SS, the Escrow Holder shall within 3 business days of the Sale Hearing return by wire transfer the Replacement Deposit to El Monte SS.

4.    Nothing in this Agreement shall be construed to prohibit or bar TB Holdings or El Monte SS from submitting overbids at the Sale Hearing.

5.    If TB Holdings or some person or entity acting on its behalf procures a loan (the "Loan") to assist El Monte SS to close on the acquisition of the Property, then TB Holdings will be paid a fee of $250,000.00 within 3 days of the Loan closing, provided that the Loan closes and meets the following parameters: the Loan amount shall be at least $5,000,000.00; the Loan shall provide for monthly interest only payments at a rate not to exceed 10% per annum; and, the maturity date of the Loan shall be not less than 18 months after Loan closing. However, notwithstanding the foregoing, El Monte SS may in its sole or absolute discretion accept or not accept the Loan and if the Loan is not accepted by El Monte SS then no fee shall be due or payable.

6.    This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter.

7.    No amendment to or modification of or rescission, termination, or discharge of this Agreement is effective unless it is in writing, identified as an amendment to or rescission, termination, or discharge of this Agreement and signed by an authorized representative of each Party.

8.    No waiver by any party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

2

9.      Any disputes between the Parties pertaining to or related to this Agreement, shall be submitted to binding arbitration to be conducted in Los Angeles, California pursuant to the rules of ADR Services, Inc.  The prevailing Party shall be entitled to reasonable attorney's fees and costs, including costs for expert witnesses.  However, this arbitration provision shall not preclude either Party from seeking injunctive relief.

10.     The Parties to this Agreement, and each of them, acknowledge that this Agreement and its reduction to the final written form is the result of good faith negotiations, that each party has had the opportunity to consult with counsel, and any statute or rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

11.     This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**TB HOLDINGS, LLC PENSION PLAN:**

By: _____
      Christopher M. Craig, Trustee

**EL MONTE SS PROPERTIES, LLC:**

By: _____
      Sean Leoni, Manager

<u>**CONSENT**</u>

I, Carolyn A. Dye, in my capacity as Chapter 7 Trustee for the estate of Temple CB, LLC Case No: 2-17-bk-10301, do hereby consent to an Assignment Agreement between TB Holdings LLC Pension Plan and El Monte SS Properties, LLC for the Counter-Offer contract dated and executed September 12, 2017, which shall be binding on El Monte SS Properties, LLC, except the Due Diligence period shall expire on October 18, 2017.

By: _____
      Carolyn A. Dye, Trustee

3

66

## CONSENT

I, Carolyn A. Dye, in my capacity as Chapter 7 Trustee for the estate of Temple CB, LLC Case No: 2-17-bk-10301, do hereby consent to an Assignment Agreement between TB Holdings LLC Pension Plan and El Monte SS Properties, LLC for the Counter-Offer contract dated and executed September 12, 2017, which shall be binding on El Monte SS Properties, LLC, except the Due Diligence period shall expire on October 18, 2017.

_____
Carolyn A. Dye, Trustee

1

# EXHIBIT "C"

# EXHIBIT "C"

**CLTA Preliminary Report Form**
(Rev. 11/06)

Order Number:  O-SA-5477071
Page Number:  1

**Updated**

 *First American Title*

# First American Title Company

**4 First American Way**
**Santa Ana, CA 92707**
California Department of Insurance License No. 151

| | |
|---|---|
| Customer Reference: | 104106-AA |
| Order Number: | O-SA-5477071 (dt) |
| | |
| Title Officer: | Debbie Tognetti |
| Phone: | (714)250-8579 |
| Fax No.: | (714)481-2956 |
| E-Mail: | octitle3@firstam.com |
| Property: | 4350 Temple City Boulevard, El Monte, CA 91731 4303 |
| | Rowland Avenue |
| | El Monte, CA 91731 |

## PRELIMINARY REPORT

In response to the above referenced application for a policy of title insurance, this company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit A attached. **The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.** Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit A. Copies of the policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Order Number: **O-SA-5477071**
Page Number: 2

Dated as of October 10, 2017 at 7:30 A.M.

The form of Policy of title insurance contemplated by this report is:

    To Be Determined

A specific request should be made if another form or additional coverage is desired.

Title to said estate or interest at the date hereof is vested in:

    TEMPLE CB, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, subject to proceedings pending in
    the Bankruptcy Court of the Central District of the U.S. District Court Los Angeles, entitled in re:
    TEMPLE CB, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, debtor, Case No. 17-10301, wherein
    a petition for relief was filed on January 10, 2017

The estate or interest in the land hereinafter described or referred to covered by this Report is:

    FEE AS TO PARCELS A THRU D AND AN EASEMENT AS TO PARCEL E

The Land referred to herein is described as follows:

(See attached Legal Description)

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said
policy form would be as follows:

1.  General and special taxes and assessments for the fiscal year 2017-2018.
    First Installment:          $28,770.84, OPEN
    Penalty:                    $0.00
    Second Installment:         $28,770.83, OPEN
    Penalty:                    $0.00
    Tax Rate Area:              23-11944
    A. P. No.:                  8577-001-028

    (Affects PARCELS A, B AND C)

1A.  General and special taxes and assessments for the fiscal year 2017-2018.

    First Installment:          $827.65, OPEN
    Penalty:                    $0.00
    Second Installment:         $827.64, OPEN
    Penalty:                    $0.00
    Tax Rate Area:              23-11944

Order Number: **O-SA-5477071**
Page Number: 3

A. P. No.:                          8577-001-041

(Affects PARCEL D)

2.  The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

3.  Covenants, conditions, restrictions and easements in the document recorded July 19, 1926 as INSTRUMENT NO. 182 IN BOOK 4666, PAGE 211 OF OFFICIAL RECORDS , but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, sexual orientation, marital status, ancestry, disability, handicap, familial status, national origin or source of income (as defined in California Government Code §12955(p)), to the extent such covenants, conditions or restrictions violate 42 U.S.C. §3604(c) or California Government Code §12955.  Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

An easement as contained in the above document.
For:                              WATER MAIN and incidental purposes.

IN BOOK 7691, PAGE 310 OFFICIAL RECORDS, APPEARS THE RECORD OF INSTRUMENT EXECUTED BY CHARLES E. GIDLEY AND DELLA N. GIDLEY, PURPORTING TO WAIVE SAID RESTRICTIONS

(Affects PARCEL D)

4.  An easement for PUBLIC STREET and incidental purposes in the document recorded September 27, 1930 as INSTRUMENT NO. 195147 OF OFFICIAL RECORDS.

5.  An easement for DRAINAGE CHANNEL and incidental purposes, recorded June 19, 1953 as INSTRUMENT NO. 1510 IN BOOK 42013, PAGE 333 of Official Records.
    In Favor of:                  PACIFIC DRIVE-IN THEATERS, INC., A CALIFORNIA CORPORATION
    Affects:                      PARCEL C

6.  An easement for DRAINAGE CHANNEL and incidental purposes, recorded August 28, 1953 as INSTRUMENT NO. 51 IN BOOK 42573, PAGE 339 of Official Records.
    In Favor of:                  PACIFIC DRIVE-IN THEATERS, INC., A CALIFORNIA CORPORATION
    Affects:                      PARCEL B

7.  An easement for POLES and incidental purposes, recorded April 05, 1955 as INSTRUMENT NO. 2306 IN BOOK 47397, PAGE 123 of Official Records.
    In Favor of:                  SOUTHERN CALIFORNIA EDISON COMPANY, A CORPORATION
    Affects:                      PARCEL C

8.  An easement for UNDERGROUND ELECTRICAL SYSTEM and incidental purposes, recorded December 22, 1955 as INSTRUMENT NO. 3936 IN BOOK 49872, PAGE 191 of Official Records.
    In Favor of:                  SOUTHERN CALIFORNIA EDISON COMPANY, A CORPORATION
    Affects:                      PARCEL C

Order Number: **O-SA-5477071**
Page Number:  4

9. An easement for ELECTRIC LINE and incidental purposes, recorded November 09, 1956 as INSTRUMENT NO. 4775 IN BOOK 52807, PAGE 419 of Official Records.
   In Favor of:              SOUTHERN CALIFORNIA EDISON COMPANY, A CORPORATION
   Affects:                  AS DESCRIBED THEREIN

10. The terms and provisions contained in the document entitled "COVENANT AND AGREEMENT" recorded June 05, 1968 as INSTRUMENT NO. 3395 OF OFFICIAL RECORDS.

11. An easement for UNDERGROUND ELECTRICAL SUPPLY SYSTEMS and incidental purposes, recorded May 27, 1976 as INSTRUMENT NO. 4615 of Official Records.
   In Favor of:              SOUTHERN CALIFORNIA EDISON COMPANY, A CORPORATION
   Affects:                  AS DESCRIBED THEREIN

12. The terms and provisions contained in the document entitled "INSTALLMENT SALE AGREEMENT" recorded July 23, 1976 as INSTRUMENT NO. 4093 of Official Records.

13. The terms and provisions contained in the document entitled "COVENANT AND AGREEMENT" recorded January 07, 1977 as INSTRUMENT NO. 77-27282 of Official Records.

14. The terms and provisions contained in the document entitled "COVENANT AND AGREEMENT" recorded March 21, 1977 as INSTRUMENT NO. 77-282438 of Official Records.

15. The terms and provisions contained in the document entitled "LESSEE OWNER'S AGREEMENT AND WAIVER" recorded October 17, 1977 as INSTRUMENT NO. 77-1147171 OF OFFICIAL RECORDS.

16. The fact that the land lies within the boundaries of the VALLEY-DURFEE Redevelopment Project Area, as disclosed by the document recorded November 21, 2007 as INSTRUMENT NO. 20072591384 OF OFFICIAL RECORDS.

17. A deed of trust to secure an original indebtedness of $4,500,000.00 recorded March 31, 2016 as INSTRUMENT NO. 16-355773 OF OFFICIAL RECORDS.

   Dated:                    March 10, 2016
   Trustor:                  TEMPLE CB, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY
   Trustee:                  CALIFORNIA TD SPECIALISTS
   Beneficiary:              THE EVERGREEN ADVANTAGE, LLC

   According to the public records, the beneficial interest under the deed of trust was collaterally assigned to CALIFORNIA REPUBLIC BANK by assignment recorded June 17, 2016 as INSTRUMENT NO. 16-700289 of Official Records.

   A notice of default recorded August 31, 2016 as INSTRUMENT NO. 16-1043032 OF OFFICIAL RECORDS.

   A notice of trustee's sale recorded December 13, 2016 as INSTRUMENT NO. 16-1577662 OF OFFICIAL RECORDS.

18. Proceedings pending in the Bankruptcy Court of the CENTRAL District of the U.S. District Court, California , entitled in re: TEMPLE CB, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, debtor, Case No. 17-10301, wherein a petition for relief was filed on January 10, 2017.

Order Number: **O-SA-5477071**
Page Number: 5

19. The fact that the land lies within the boundaries of the NORTHWEST EL MONTE Redevelopment Project Area, as disclosed by various documents of record.

20. Any easements and/or servitudes affecting easement parcel(s) E herein described.

21. Rights of the public in and to that portion of the land lying within any Road, Street, Alley or Highway.

22. Water rights, claims or title to water, whether or not shown by the public records.

23. Any facts, rights, interests or claims which would be disclosed by a correct ALTA/NSPS survey.

24. Rights of parties in possession.

**Prior to the issuance of any policy of title insurance, the Company will require:**

25. An ALTA/NSPS survey of recent date which complies with the current minimum standard detail requirements for ALTA/NSPS land title surveys.

26. With respect to TEMPLE CB, LLC, a limited liability company:
a. A copy of its operating agreement and any amendments thereto;
b. If it is a California limited liability company, that a certified copy of its articles of organization (LLC-1) and any certificate of correction (LLC-11), certificate of amendment (LLC-2), or restatement of articles of organization (LLC-10) be recorded in the public records;
c. If it is a foreign limited liability company, that a certified copy of its application for registration (LLC-5) be recorded in the public records;
d. With respect to any deed, deed of trust, lease, subordination agreement or other document or instrument executed by such limited liability company and presented for recordation by the Company or upon which the Company is asked to rely, that such document or instrument be executed in accordance with one of the following, as appropriate:
(i) If the limited liability company properly operates through officers appointed or elected pursuant to the terms of a written operating agreement, such document must be executed by at least two duly elected or appointed officers, as follows: the chairman of the board, the president or any vice president, and any secretary, assistant secretary, the chief financial officer or any assistant treasurer;
(ii) If the limited liability company properly operates through a manager or managers identified in the articles of organization and/or duly elected pursuant to the terms of a written operating agreement, such document must be executed by at least two such managers or by one manager if the limited liability company properly operates with the existence of only one manager.
e. Other requirements which the Company may impose following its review of the material required herein and other information which the Company may require

Order Number: **O-SA-5477071**
Page Number: 6

| INFORMATIONAL NOTES |
|:---:|

Note: The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than the certain dollar amount set forth in any applicable arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. If you desire to review the terms of the policy, including any arbitration clause that may be included, contact the office that issued this Commitment or Report to obtain a sample of the policy jacket for the policy that is to be issued in connection with your transaction.

1. According to the latest available equalized assessment roll in the office of the county tax assessor, there is located on the land a(n) COMMERCIAL STRUCTURE known as 4350 TEMPLE CITY BOULEVARD, EL MONTE, CALIFORNIA.

   (Affects PARCELS A, B AND C)

2. According to the latest available equalized assessment roll in the office of the county tax assessor, there is located on the land a(n) COMMERCIAL STRUCTURE known as 4303 ROWLAND AVENUE, EL MONTE, CA.

   (Affects PARCEL D)

3. According to the public records, there has been no conveyance of the land within a period of twenty-four months prior to the date of this report, except as follows:

   None

The map attached, if any, may or may not be a survey of the land depicted hereon. First American expressly disclaims any liability for loss or damage which may result from reliance on this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.

Order Number: **O-SA-5477071**
Page Number: 7

## LEGAL DESCRIPTION

Real property in the City of El Monte, County of Los Angeles, State of California, described as follows:

PARCEL A: [APN: 8577-001-028 (PORTION)]

THAT PORTION OF LOT 6 OF F.W. GIBSON'S TRACT, IN THE CITY OF EL MONTE, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 15 PAGE 39 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BOUNDED BY THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF ELLIS LANE AS CONDEMNED BY THE FINAL DECREE ENTERED IN CASE NO. 270698, A CERTIFIED COPY THEREOF HAVING BEEN REGISTERED AS DOCUMENT NO. 195147, ON CERTIFICATE NO. OM-38460 IN THE OFFICE OF THE REGISTRAR OF LAND TITLES IN SAID COUNTY, SAID POINT BEING DISTANT ALONG SAID EASTERLY LINE NORTH 18° 10' 55" EAST 190.00 FEET FROM THE INTERSECTION OF SAID EASTERLY LINE WITH THE NORTHEASTERLY LINE OF THE SOUTHWESTERLY 200.00 FEET OF SAID LOT 6; THENCE SOUTH 71° 49' 05" EAST 324.42 FEET; THENCE SOUTH 18° 10' 55" WEST 209.38 FEET TO SAID NORTHEASTERLY LINE OF THE SOUTHWESTERLY 200 FEET OF SAID LOT; THENCE ALONG SAID NORTHEASTERLY LINE NORTH 68° 24' 00" WEST 335.01 FEET TO THE WESTERLY LINE OF SAID LOT 6; THENCE ALONG SAID WESTERLY LINE NORTH 18° 10' 55" EAST TO A LINE THAT BEARS NORTH 71° 49' 05" WEST AND THAT PASSES THROUGH THE POINT OF BEGINNING; THENCE SOUTH 71° 49' 05" EAST TO THE POINT OF BEGINNING.

PARCEL B: [APN: 8577-001-028 (PORTION)]

THAT PORTION OF LOT 6 OF F.W. GIBSON'S TRACT, IN THE CITY OF EL MONTE, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 15 PAGE 39 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BOUNDED BY THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF ELLIS LANE AS CONDEMNED BY THE FINAL DECREE ENTERED IN CASE NO. 270698, A CERTIFIED COPY THEREOF HAVING BEEN REGISTERED AS DOCUMENT NO. 195147, ON CERTIFICATE NO. OM-38460 IN THE OFFICE OF THE REGISTRAR OF LAND TITLES IN SAID COUNTY, SAID POINT BEING DISTANT ALONG SAID EASTERLY LINE NORTH 18° 10' 55" EAST 190.00 FEET FROM THE INTERSECTION OF SAID EASTERLY LINE WITH THE NORTHEASTERLY LINE OF THE SOUTHWESTERLY 200.00 FEET OF SAID LOT 6; THENCE SOUTH 71° 49' 05" EAST 324.42 FEET; THENCE SOUTH 18° 10' 55" WEST 209.38 FEET TO SAID NORTHEASTERLY LINE OF THE SOUTHWESTERLY 200 FEET OF SAID LOT; THENCE ALONG SAID NORTHEASTERLY LINE SOUTH 68° 24' EAST 301.87 FEET MORE OR LESS TO THE EASTERLY LINE OF SAID LOT 6; THENCE ALONG SAID EASTERLY LINE NORTH 18° 09' 26" EAST, 258.66 FEET TO THE SOUTHEAST CORNER OF THE LAND DESCRIBED IN THE DEED TO H.E. COOMBES RECORDED AS INSTRUMENT NO. 1510 ON JUNE 19, 1953, RECORDED IN BOOK 42013 PAGE 333 OF OFFICIAL RECORDS, RECORDS OF SAID COUNTY, THENCE NORTH 71° 49' 05" WEST 635.64 FEET TO THE WESTERLY LINE OF SAID LOT; THENCE ALONG SAID WESTERLY LINE SOUTH 18° 10' 55" WEST TO A LINE THAT BEARS NORTH 71° 49' 05" WEST AND THAT PASSES THROUGH THE POINT OF BEGINNING; THENCE SOUTH 71° 49' 05" EAST 10.00 FEET TO THE POINT OF BEGINNING.

PARCEL C: [APN: 8577-001-028 (PORTION)]

THAT PORTION OF LOT 6 OF F.W. GIBSON'S TRACT, IN THE CITY OF EL MONTE, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 15 PAGE 39 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WESTERLY LINE OF SAID LOT, WHICH IS DISTANT SOUTH 18° 10' 55"

Order Number: **O-SA-5477071**
Page Number: 8

WEST 1079.08 FEET FROM THE NORTHWEST CORNER OF SAID LOT, SAID POINT BEING ALSO THE SOUTHWEST CORNER OF THE LAND DESCRIBED IN DEED TO MILLER DIAL & NAME PLATE COMPANY, RECORDED ON MAY 26, 1952 AS DOCUMENT NO. 9502-U IN CERTIFICATE NO. 1AL-112713; THENCE ALONG THE SOUTHERLY LINE OF SAID LAST MENTIONED LAND SOUTH 71° 49' 05" EAST 635.53 FEET, MORE OR LESS, TO THE EASTERLY LINE OF SAID LOT; THENCE ALONG SAID EASTERLY LINE SOUTH 18° 09' 26" WEST 242.05 FEET; THENCE NORTH 71° 49' 05" WEST TO THE WESTERLY LINE OF SAID LOT; THENCE NORTHERLY ALONG SAID WESTERLY LINE TO THE POINT OF BEGINNING.

PARCEL D: [APN: 8577-001-041]

THE WESTERLY 200 FEET OF THE SOUTHERLY 80.5 FEET, MEASURING ALONG THE FRONT AND REAR LINES OF LOT 2 OF THE GIDLEY-PEIRSON TRACT, IN THE CITY OF EL MONTE, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 21, PAGE 64 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

SAID ABOVE DESCRIBED LAND ALSO KNOWN AS PARCEL 2 OF PARCEL MAP NO. 193, AS PER MAP FILED IN BOOK 5, PAGE 25 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL E:

AN EASEMENT APPURTENANT TO PARCEL "D" ABOVE DESCRIBED FOR INGRESS AND EGRESS, OVER UTILITY PURPOSES TO BE USED IN COMMON WITH OTHERS, IN, OVER, UNDER, AND ACROSS THE FOLLOWING DESCRIBED LAND:

THE NORTHERLY 15 FEET OF THE SOUTHERLY 80.5 FEET, MEASURED ALONG THE FRONT AND REAR LINES OF LOT 2 OF THE GIDLEY-PEIRSON TRACT, IN THE CITY OF EL MONTE, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 21, PAGE 64 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THE WESTERLY 200 FEET THEREOF

Order Number: **O-SA-5477071**
Page Number: 9



Order Number: **O-SA-5477071**
Page Number: 10

## *NOTICE*

Section 12413.1 of the California Insurance Code, effective January 1, 1990, requires that any title insurance company, underwritten title company, or controlled escrow company handling funds in an escrow or sub-escrow capacity, wait a specified number of days after depositing funds, before recording any documents in connection with the transaction or disbursing funds. This statute allows for funds deposited by wire transfer to be disbursed the same day as deposit. In the case of cashier's checks or certified checks, funds may be disbursed the next day after deposit. In order to avoid unnecessary delays of three to seven days, or more, please use wire transfer, cashier's checks, or certified checks whenever possible.

Order Number: **O-SA-5477071**
Page Number: 11

# INCOMING DOMESTIC WIRE INSTRUCTIONS

**Beware of cyber-crime!** If you receive an e-mail or any other communication that appears to be generated from a First American Title Company employee that contains new, revised or altered bank wire instructions, consider it suspect and call our office at a number you trust.

## ** Our Wire Instructions Do Not Change. **

**Funds from other than buyer or seller:** Other than funds from a designated lender, real estate agent or broker, or the attorney of record, we will only accept incoming wires that are from the buyer or seller on a transaction. Other third party deposits not accompanied by appropriate instructions will be returned to the remitter.

**Funds from a U.S. Bank:** Funds should be wired from a bank within the United States.  Notify our office at (714)250-3000  when you have transmitted your wire.

**Funds from a non-U.S. Bank:**  If your funds are being wired from a non-U.S. bank, additional charges may apply.  Contact our office for Incoming International Wiring Instructions.

**ACH Transfers are NOT wire transfers:**  An ACH transfer is not immediately available funds and requires additional time for clearance.  An ACH transfer cannot be accepted for an imminent closing. Acceptance of ACH transfers are subject to state law. Contact our office at (714)250-3000  prior to sending funds by ACH transfer.

Contact our office at (714)250-3000 when funds are sent.


PAYABLE TO:          First American Title Company
BANK:                First American Trust, FSB
ADDRESS              5 First American Way, Santa Ana, CA 92707
ACCOUNT NO.:         3012500000
ROUTING NUMBER       122241255

PLEASE REFERENCE THE FOLLOWING:
PROPERTY:            4350 Temple City Boulevard,  El Monte, CA 91731
FILE NUMBER:         O-SA-5477071

FIRST AMERICAN TRUST, FSB CONTACT INFO: Banking Services (877)600-9473

## WIRES MAY BE RETURNED IF THE FILE NUMBER
## AND PROPERTY REFERENCE ARE NOT INCLUDED

Order Number: **O-SA-5477071**
Page Number: 12

**EXHIBIT A**
**LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (BY POLICY TYPE)**

**CLTA STANDARD COVERAGE POLICY – 1990**
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy; or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public, records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

**CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)**
EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;

*First American Title*
Page 12 of 17

Order Number: **O-SA-5477071**
Page Number: 13

    d.  improvements on the Land;
    e.  land division; and
    f.  environmental protection.
    This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2.    The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3.    The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4.    Risks:
    a.  that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
    b.  that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
    c.  that result in no loss to You; or
    d.  that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5.    Failure to pay value for Your Title.
6.    Lack of a right:
    a.  to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b.  in streets, alleys, or waterways that touch the Land.
    This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7.    The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8.    Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9.    Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $10,000 |
| Covered Risk 18: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 19: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 21: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $5,000 |

## 2006 ALTA LOAN POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.    (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

        (i) the occupancy, use, or enjoyment of the Land;
        (ii) the character, dimensions, or location of any improvement erected on the Land;
        (iii) the subdivision of land; or
        (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.    Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.    Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

Order Number: **O-SA-5477071**
Page Number: 14

(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
(a) a fraudulent conveyance or fraudulent transfer, or
(b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

[Except as provided in Schedule B - Part II,[ t[or T]his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

### [PART I

[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:
1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by  persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

### PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:]

## 2006 ALTA OWNER'S POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

(i) the occupancy, use, or enjoyment of the Land;
(ii) the character, dimensions, or location of any improvement erected on the Land;
(iii) the subdivision of land; or
(iv) environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
(b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
(a) created, suffered, assumed, or agreed to by the Insured Claimant;
(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

Order Number: **O-SA-5477071**
Page Number: 15

(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 or 10); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
(a) a fraudulent conveyance or fraudulent transfer, or
(b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:
[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.
7. [Variable exceptions such as taxes, easements, CC&R's, etc. shown here.]

### ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-26-10)
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;
    (ii) the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk  5, 6, 13(c), 13(d), 14 or 16.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the

*First American Title*
Page 15 of 17

Order Number: **O-SA-5477071**
Page Number:  16

Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.

8.  The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

    (a) a fraudulent conveyance or fraudulent transfer, or

    (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

Order Number: **O-SA-5477071**
Page Number: 17

 **First American Title**

**Privacy Information**
**We Are Committed to Safeguarding Customer Information**
In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

**Applicability**
This Privacy Policy governs our use of the information that you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its Fair Information Values.

**Types of Information**
Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:
- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a consumer reporting agency.

**Use of Information**
We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

**Former Customers**
Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**
We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

**Information Obtained Through Our Web Site**
First American Financial Corporation is sensitive to privacy issues on the Internet. We believe it is important you know how we treat the information about you we receive on the Internet.
In general, you can visit First American or its affiliates' Web sites on the World Wide Web without telling us who you are or revealing any information about yourself. Our Web servers collect the domain names, not the e-mail addresses, of visitors. This information is aggregated to measure the number of visits, average time spent on the site, pages viewed and similar information. First American uses this information to measure the use of our site and to develop ideas to improve the content of our site.
There are times, however, when we may need information from you, such as your name and email address. When information is needed, we will use our best efforts to let you know at the time of collection how we will use the personal information. Usually, the personal information we collect is used only by us to respond to your inquiry, process an order or allow you to access specific account/profile information. If you choose to share any personal information with us, we will only use it in accordance with the policies outlined above.

**Business Relationships**
First American Financial Corporation's site and its affiliates' sites may contain links to other Web sites. While we try to link only to sites that share our high standards and respect for privacy, we are not responsible for the content or the privacy practices employed by other sites.

**Cookies**
Some of First American's Web sites may make use of "cookie" technology to measure site activity and to customize information to your personal tastes. A cookie is an element of data that a Web site can send to your browser, which may then store the cookie on your hard drive.
FirstAm.com uses stored cookies. The goal of this technology is to better serve you when visiting our site, save you time when you are here and to provide you with a more meaningful and productive Web site experience.
----------------------------------------------------------------------------
**Fair Information Values**
**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.
**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.
**Use** We believe we should behave responsibly when we use information about a consumer in our business. We will obey the laws governing the collection, use and dissemination of data.
**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.
**Education** We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy. We will instruct our employees on our fair information values and on the responsible collection and use of data. We will encourage others in our industry to collect and use information in a responsible manner.
**Security** We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.

Form 50-PRIVACY (9/1/10)                    Page 1 of 1                    Privacy Information (2001-2010 First American Financial Corporation)

Main File No. 34568A    Page # 42

## BUILDING SKETCH (Page - 1)

| Borrower | Jay Hooper | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 4350 Temple City Blvd | | | | | | | |
| City | El Monte | County | Los Angeles | | State | CA | Zip Code | 91731 |
| Lender/Client | Pointe of View Intl Mortgage | | | | | | | |



# DECLARATION OF JEFF LUSTER

# DECLARATION OF JEFF LUSTER

## DECLARATION OF JEFF LUSTER

I, Jeff Luster, declare:

1.     I am a real estate broker with and the CEO of Major Properties. I am licensed by the State of California, Cal BRE License Number 00636424.  The statements made herein are of my own personal knowledge and, if called as a witness, I could and would competently testify thereto.

2.     Major Properties and Coldwell Banker was the firm employed by Carolyn A. Dye, the Chapter 7 Trustee herein ("Trustee"), to market and sell the real property situated in the City of El Monte, County of Los Angeles, and commonly described as 4350 Temple City Boulevard, El Monte, CA 91731 (APN: 8577-001-028 & 041) (the "Property").  I am the broker (along with Rene Mexia of my firm and William Friedman of Coldwell Banker) who was responsible for marketing the Property.

3.     Based on comparable sales of other similar properties in the area and our experience in the marketing and sale of real properties of similar kind and condition as the Property, it was determined that a fair listing price for the Property would be $8.5 million

4.     The Debtor gave us access to the Property, which was a large industrial warehouse. We sent multiple e-mails regarding the property to a list of 35,000 parties known to us to be prospective purchasers of industrial properties in the Los Angeles area.  We also submitted to Multiple Listing Service with photos upon listing.

5.     As of the date of this Declaration, I had received several inquiries about the Property but the offer which I recommended the Trustee accept was was the highest and best at the time it was received.

6.     As noted above, other prospective buyers have expressed interest in the Property and when I receive notice of the hearing date for the Sale Motion, I will let these other parties know of the date and time for the hearing and will add the information regarding the overbid procedure/process and the date and time of the hearing in the multiple listing service and will also provide the procedure for potential overbidders to obtain a copy of the Motion.

7.     We will continue to market the Property and will provide prospective overbidders with a copy of the Motion and overbidding procedures.

I declare under penalty of perjury under the laws of the United States of America that the

1  foregoing is true and correct.

2      Executed this 20th day of October, 2017 at Los Angeles, California.

3

4

5      _____
       Jeff Luster
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| In re:  TEMPLE CB, LLC. | CHAPTER: 7 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:17-bk-10301-BR |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 3435 Wilshire Blvd., Ste. 990, Los Angeles, CA 90010.

A true and correct copy of the foregoing document entitled (*specify*): ***Trustee's Motion For Order Authorizing Sale of Real Property of the Estate [4350 Temple City Blvd., El Monte, CA 91731] Free and Clear of Liens and Interests, Subject to Higher and Better Offers, and Approving Overbidding Procedures; Declarations of Carolyn A. Dye and Jeff Luster in Support Thereof*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ***October 20, 2017***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

James A Dumas     jdumas@dumas-law.com, jdumas@ecf.inforuptcy.com
Carolyn A Dye (TR)     trustee@cadye.com, cdye@ecf.epiqsystems.com;atty@cadye.com
Oscar Estrada     oestrada@ttc.lacounty.gov
Jehu Hand     jehu@jehu.com
Christian T Kim     ckim@dumas-law.com, ckim@ecf.inforuptcy.com
Ron Maroko     ron.maroko@usdoj.gov
United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
Edward T Weber     ed@eweberlegal.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL:**
On (*date*) ***October 20, 2017***, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ***October 20, 2017***, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

United States Bankruptcy Court                              BY Personal Delivery Janney & Janney
Honorable Barry Russell
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

J. Thomas Hand                              jthomashand@gmail.com
Dave Gondek                                 dgondek@omlolaw.com
Larry McDaniel                              larry.mcdaniel@dtsc.ca.gov

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| *September 13, 2017* | Danielle M. Landeros | */s/ Danielle M. Landeros* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                              **F 9013-3.1.PROOF.SERVICE**